**BASS ENTERPRISES PRODUCTION CO., et. al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 95–52 L.

United States Court of Federal Claims.

May 24, 1996.

Harold L. Hensley, Jr. and Karolyn Nelson, Roswell, New Mexico, and James M. Hudson, Midland, Texas, for plaintiffs.

Susan V. Cook and Michael Martin, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

This case concerns the Bureau of Land Management's denial of plaintiffs' eight Applications for Permits to Drill oil and gas in New Mexico. Plaintiffs contend that this denial constituted a taking of their property interest. Defendant argues that the denial prevented plaintiffs from drilling only temporarily and that it did not effect a taking.

### Facts

Plaintiffs own the record title, operating rights, and rights to oil and gas produced from a federal lease executed in 1952 covering the south half of Section 31 in Eddy County, New Mexico. The United States condemned the surface of Section 31 and the initial 6000 feet of the subsurface in 1977 for construction of the Waste Isolation Pilot Plant (WIPP). The WIPP was designed for the Department of Energy as a facility to store nuclear waste in an ancient salt formation 2000 feet below the surface.

Congress passed the WIPP Land Withdrawal Act in 1992 to obtain land from the public domain for waste disposal and to establish a regulatory framework to govern the site. The Act generally prohibits drilling through and underneath the site from outside the withdrawn lands. It exempts rights existing at the time of withdrawal. Plaintiffs' existing rights were not to be affected unless the Environmental Protection Agency determined that it had to acquire plaintiffs' lease in order to comply with final disposal regulations or with the Solid Waste Disposal Act.

The EPA promulgated radioactive waste disposal regulations pursuant to the Act in December 1993. EPA was required to issue criteria by which it could assess compliance

with the disposal regulations by October 1994. As of the filing date of plaintiffs' January 1995 complaint, EPA had not issued those criteria.

Plaintiffs submitted eight Applications for Permits to Drill to the Bureau of Land Management, proposing to drill eight wells in the south half of Section 31. BLM denied the applications in August 1994. After plaintiffs filed suit, BLM issued a supplementary decision characterizing its denial as a delay of regulatory action pending EPA's determination of whether oil and gas development on the lease was consistent with DOE compliance with the final disposal regulations.[1]

### Arguments

Plaintiffs argue that the permit denials effected a taking of their existing rights under the lease. These rights included drilling and removing the oil and gas deposits on the subject lands. According to plaintiffs, BLM had the final decision-making authority over the applications, and it issued a final decision denying them. They see no legal nexus between BLM's permit denials and EPA's consideration of whether to authorize the Energy Department to purchase the lease. Plaintiffs contend that BLM's denial constituted a taking irrespective of what EPA may decide later.

■ Defendant's principal argument is that the permit denials deprived plaintiffs of the right to drill only temporarily, and that the economic impact of the denials does not rise to the level of a permanent taking.[2] No taking occurs until EPA decides to condemn plaintiffs' land, according to defendant. So long as the possibility exists that the permits may be granted, there can be no taking.

Defendant also contends that plaintiffs did not have reasonable investment-backed expectations because of various provisions in the lease and because of regulations that govern mining in the area. For example, the Government had authority to modify operations on BLM leases in the interest of public safety pursuant to United States Geological Survey and BLM regulations. The lease is subject to all reasonable regulations of the Secretary of the Interior. Drilling and production may be restricted in the public interest. Also, plaintiffs entered an agreement with adjoining land owners that authorizes BLM to alter the rate of development and production in the interest of conservation. The agreement is governed by the Mineral Leasing Act, which allows the Secretary to modify plaintiffs' right to select the site and the timing of drilling to protect the public interest and the conservation of natural resources. In the Government's view, these restrictions deprived plaintiffs of the reasonable investment-backed expectations necessary to prove a takings claim.

The Government asserts that the character of governmental action in this case weighs against finding that a taking occurred. According to defendant, the permit denials were only temporary. Although BLM denied all eight of the applications, it intended only to defer consideration of the applications until after EPA issued the necessary criteria, DOE submitted its application to use the site for waste disposal, and EPA approved or denied the application. *See* note 1 *supra*. Plaintiffs' proposed drilling operation was not evaluated or denied on its merits, according to defendant, and therefore the denial was not a taking.

1. After the criteria are issued, EPA must certify whether the Department of Energy's application to use the site for waste disposal demonstrates compliance with disposal regulations. Defendant states that DOE has committed itself to submitting the application by October 1996. EPA will have one year after that to deny the application. DOE must demonstrate the site's compliance with land disposal restrictions by requesting a determination that no migration of hazardous substances will occur. EPA will evaluate the no-migration determination. Defendant represents that DOE will submit its petition in .

June 1996. After this administrative process is completed, EPA will determine whether plaintiffs' lease must be acquired.

2. We declined to hear evidence regarding a temporary takings theory. A temporary takings analysis requires an end to the government regulation in order to measure the taking. *See Dufau v. United States*, 22 Cl.Ct. 156 (1990), *aff'd*, 940 F.2d 677, 1991 WL 130314 (Fed.Cir.1991); *1902 Atlantic Limited v. United States*, 26 Cl.Ct. 575 (1992).

### Analysis

■ We examine three criteria to determine whether a government regulation effects a taking: (1) The economic impact of the regulation on the claimant, (2) The character of the governmental action, and (3) The extent to which the regulation interfered with distinct investment-backed expectations. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

### 1. Economic Impact

■ To ensure that not every government regulation of private property results in a taking, plaintiffs must show "a serious financial loss from the regulatory imposition." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed.Cir.1994). This showing is more commonly deemed denial of "economically viable use of the land." *Id.* (citing *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)).

BLM witnesses stated that the purpose of their decision was to deny the permits temporarily, pending further action by EPA and DOE. The witnesses acknowledged that BLM had three options after reviewing the permits: (1) deny the permits, (2) grant the permits, or (3) delay action. The Roswell district of BLM did not want to delay action; it recommended denial.

BLM issued a decision denying the permits "at this time" because the drilling could "potentially jeopardize the WIPP site." The state BLM office wanted to delay taking action; it now says it denied the applications only to give plaintiffs appeal rights.[3] The State Director of BLM testified that the Bureau considered whether a denial pending future action would result in a takings claim. BLM was aware that a denial could result in a takings suit.

According to the State Director, he could not delay action officially because under the regulations providing for delay, he would have been required to set a date by which it would take action; BLM could not foresee such a date.[4]

After plaintiffs filed suit on the basis of the permit denials, BLM issued a "supplementary decision" characterizing the denial as a delay of regulatory action. BLM felt constrained to postpone a final decision "until EPA certifies the WIPP as a solid waste disposal site...." The supplemental decision was prompted by plaintiffs' lawsuit.

The Government argues that plaintiffs are likely to get permits to drill in the near future and that this "delay" is not a taking; *i.e.,* the economic impact is not severe.[5] According to defendant, the possibility that a permit will be granted prevents the Government's delay from becoming a permanent taking. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126–27, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985).

The plaintiff in *Riverside* had not applied for a permit. The question was whether the requirement that a person obtain a permit "takes" the property. The Court noted that a taking occurs only when a permit is denied

---

3. The district manager of BLM also viewed the denial as a delay of regulatory action rather than a denial. She testified that generally, a delay decision is not final agency action. However, this decision was made purportedly to give plaintiffs appeal rights from a final agency action. Defendant's counsel represented that the Government never suggested that this was not final decision; it was a final decision that could be appealed. The Government apparently is frustrated by plaintiffs' decision to file suit in this court rather than appealing through the agency. However, the Government cannot control plaintiffs' course of action once it issues a final decision denying a permit.

4. Yet defendant seemed confident in predicting at trial that EPA and DOE will fulfill their respective administrative tasks on a date certain.

5. The Supreme Court was faced with a similar issue in *Lucas*. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1010–13, 112 S.Ct. 2886, 2890–91, 120 L.Ed.2d 798 (1992). There, the regulation had been amended after Lucas' takings claim to add a discretionary "special permit" procedure by which possibly could acquire a permit. The Court held that the "special permit" procedure was relevant only to the ripeness of Lucas' challenge. The taking was unconditional and permanent at the time of the permit denial irrespective of the possibility that future permits would be granted. *Id.* (citation omitted). Here, as in *Lucas*, defendant does not challenge the ripeness of plaintiffs' claim; the Government agrees that the denial constituted final agency action.

and the effect of the denial is to deny the property owner all economic use of his property. *Id.* That is, final agency action is required. According to government counsel, defendant does not contend that BLM's decision did not constitute final agency action. The State Director could not say with certainty that plaintiffs ultimately will be able to drill the wells.

Defendant proposes the novel but unpersuasive argument that the permit denial actually was a final decision to postpone making a final decision. The WIPP Land Withdrawal Act concerns acquisition of leases, not approval of Applications for Permits to Drill. BLM had the ultimate authority to approve or deny the permits regardless of what DOE or EPA wanted. The State BLM wanted to delay action, but it could not. The regulations governing delay required it to set a date certain, and it was not willing to do so. BLM took action, and it denied the permits. It cannot now, *ex post,* characterize a clear decision to deny as a decision to delay action.

The permits were not granted or delayed; they were denied. Plaintiffs could have reapplied for permits, but they were not required to do so. They could have appealed through the agency, but they were not required to do that either. The only question is whether the BLM action denied plaintiffs economically viable use of their land.

Plaintiffs' lease includes approximately 320 acres in the south half of Section 31, and an additional 80 acres north and west in Section 26. No access to Section 26 is available for drilling. Section 31 is the only location with access for drilling operations. Plaintiffs owned the exclusive right to mine oil and gas on the leased lands. Because of the permit denials, plaintiffs were deprived of the opportunity to exploit the part of their lease encompassing the south half of Section 31. Plaintiffs' witnesses testified that the permit denials rendered the lease interest valueless.

■ The economic impact of a regulation on land is measured by comparing the fair market value of the property before and after the alleged date of taking. *Loveladies,* 28 F.3d at 1180. The Government valued plaintiffs' lease at $360,000 on the date of the taking. Plaintiffs valued their lease at $10.7 million. Defendant argued in its brief that plaintiffs could have sold, leased, or farmed the property. This is absurd. Plaintiffs did not own the land; they leased it solely for the purpose of drilling for oil and gas. Any buyer or lessee of the land would buy or lease with the same intent. The Government essentially required that the land be left substantially in its natural state. The lease had no value to plaintiffs or to potential buyers or lessees after BLM denied the permits to drill. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1018, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992) ("regulations that leave the owner of land without economically beneficial or productive options for its use—typically ... requir[e] land to be left substantially in its natural state....") Plaintiffs have suffered serious financial loss from a regulatory imposition.

### 2. *Character of Governmental Action*

■ Considering the character of governmental action once required us to weigh "the purpose and importance of the public interest reflected in the regulatory imposition" and balance plaintiffs' liberty interest against the Government's need to protect the public interest. *Loveladies,* 28 F.3d at 1176. After *Lucas,* however, this inquiry is:

> simply one of basic property ownership rights: within the bundle of rights which property lawyers understand to constitute property, is the right or interest at issue, as a matter of law, owned by the property owner or reserved to the state.... If the imposed restraint would have been justified under the state's traditional nuisance law, then the property owner's bundle of rights did not include the right claimed, and no taking could occur.

*Loveladies,* 28 F.3d at 1179; *See Lucas,* 505 U.S. at 1027, 112 S.Ct. at 2899.

According to the Federal Circuit, the effect of *Lucas* was to change examination of the character of the governmental action from an ad hoc balancing process to a situation in which state property law controls. *Loveladies,* 28 F.3d at 1179. The Court in *Lucas* noted that a court need not inquire

into the public interest advanced in support of a regulation where, as here, the regulation denied all economically beneficial or productive use of the land. *Lucas,* 505 U.S. at 1015, 112 S.Ct. at 2893 (citations omitted).

■ If a regulation deprives land of all economically beneficial or productive use, a taking occurs unless the property owner's activity was not within the owner's title to begin with. *Id.* at 1027, 112 S.Ct. at 2899. If adjacent land owners could have prevented plaintiffs' drilling under the law of private nuisance or if the State could have prevented the use under its power to abate nuisances, no taking exists. *Id.* at 1029–30, 112 S.Ct. at 2900–01. The Government's argument relating to the character of governmental action is that the regulatory action delayed rather than denied plaintiffs' drilling rights. Defendant did not argue that plaintiffs' activities constituted a nuisance or a noxious use.

### 3. Investment-backed Expectations

■ This criterion limits takings recoveries to plaintiffs who can show that they "bought their property in reliance on a state of affairs that did not include *the challenged regulatory regime.*" *Loveladies,* 28 F.3d at 1177 (citations omitted) (emphasis added). Plaintiffs who bought property with knowledge of the restraint are said to have no reliance interest, or are said to have assumed the risk of economic loss. The market already has discounted for the restraint so that a purchaser shows no loss in investment. *Id.*

Defendant argues that the statutory and regulatory schemes that govern drilling and certain provisions in plaintiffs' lease prevented plaintiffs from demonstrating reasonable investment-backed expectations. Plaintiffs acquired the lease in the 1950s. The WIPP Land Withdrawal Act was passed in 1992. Although regulations and lease provisions governed the property, none prohibited plaintiffs' drilling entirely. The regulation at issue provided that existing rights under plaintiffs' lease would not be affected unless the Administrator determined that acquisition of the lease was required to comply with final disposal regulations. BLM denied plaintiffs' applications because of the Act; it believed plaintiffs' drilling might affect the WIPP site. Plaintiffs' rights were affected prior to action by EPA.

Plaintiffs' expectations were reasonable despite regulations and lease provisions governing mining. We heard extensive and persuasive testimony that plaintiffs' mining plan was feasible and that the mines would be productive. Plaintiffs leased the land with the reasonable investment-backed expectations of drilling and gaining profit. The permit denials interfered with these reasonable expectations.

### Conclusion

We determined at trial that government action denied plaintiffs all economically beneficial use of their property, and we asked that the parties agree to reasonable damages. So far, they have not been willing to do so. If the parties still have not reached a settlement within ten days, we will issue findings of fact related to just compensation and enter judgment thereafter.