**BASS ENTERPRISES PRODUCTION CO. et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 95–52 L.

United States Court of Federal Claims.

Nov. 13, 2002.

Harold L. Hensley, Jr. and James M. Hudson, Hinkle, Hensley, Shanor & Martin, L.L.P. Roswell, New Mexico, for plaintiff.

Susan V. Cook and Kristine S. Tardiff, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

This court ruled in March 2002 that plaintiffs were entitled to just compensation for a temporary taking of their oil and gas leases. The Clerk entered judgment for plaintiffs in the amount of $1,137,808 plus costs and fees pursuant to 42 U.S.C. § 4654(c). The Government moved to reconsider after the Supreme Court issued its decision in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). We granted that motion and heard oral arguments in Albuquerque, New Mexico. Defendant is correct that *Tahoe* requires an inquiry into the *Penn Central* factors, and we find that such an analysis does not support plaintiffs' takings claim.

## BACKGROUND

Plaintiffs own the right to extract oil and gas from a 1952 federal lease covering the south half of Section 31 in Eddy County, New Mexico. The Government condemned the surface of Section 31 and 6000 feet of the subsurface in 1977 for construction of a nuclear waste storage facility known as the Waste Isolation Pilot Plant (WIPP).

Congress passed the WIPP Land Withdrawal Act in 1992, to obtain land from the public domain for nuclear waste disposal and to establish a regulatory framework to govern the site. Pub.L. 102–579, 106 Stat. 4777, as amended by Pub.L. 104–201, 110 Stat. 2422. The Act generally prohibited drilling through and underneath the site from outside the withdrawn lands, but exempted rights existing at the time of the withdrawal. Plaintiffs' existing rights were not to be affected, unless the Environmental Protection Agency determined that acquiring plaintiffs' leases was necessary to comply with final disposal regulations or with the Solid Waste Disposal Act. 42 U.S.C. § 6901. EPA was required to issue criteria that would assess compliance with disposal regulations by October 1994. EPA had not issued those criteria when plaintiffs filed their complaint in January 1995.

Plaintiffs submitted eight "Applications for Permits to Drill" wells in the WIPP area. The Bureau of Land Management denied those applications in August 1994. After plaintiffs filed suit in 1995, BLM issued a "supplementary decision" characterizing its denial as a delay of regulatory action pending EPA's determination of whether oil and gas development on the lease was consistent with final disposal regulations.

We ruled after trial in May 1996 that BLM was the only agency that had the authority to grant or deny plaintiffs' applications, and that it had denied them. Its later characterization of the denials in "supplemental decisions" was litigation-inspired. *Bass Enters. Prod. Co. v. United States,* 35 Fed.Cl. 615, 618 (1996).

The Federal Circuit ruled on appeal that a permanent taking could not have occurred because Congress "mandated [an] end to the regulatory process [which] will result in a decision whether or not to condemn the leases." *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 896 (Fed.Cir.1998). While defendant did not take Bass' property rights permanently, the Circuit remanded the case for a determination "of whether the government has effected a temporary taking of Bass' lease." *Id.* at 896–97.

Soon thereafter, the parties asked that we rule on the proper method of valuing a temporary taking. We determined that although fair rental value is considered to be just compensation for a temporary taking, in this case it would produce a windfall for plaintiffs because they retained the right to extract oil and gas after the delay. We held that the proper measure of damages could be calculated by applying an appropriate interest factor to the difference between the present values of cash flows from the wells' production, with and without the forty-five-month delay. We asked that the parties stipulate damages based on this formula, but they could not do so.

Trial on the issue remanded by the Federal Circuit addressed whether defendant's delay in granting plaintiffs' applications had effected a temporary taking of their property. Plaintiffs argued a categorical or "per se temporary regulatory taking," relying on *Lu-*

cas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Bass Enters. Prod. Co. v. United States, 45 Fed.Cl. 120, 122 (1999). We found that plaintiffs were denied all economically beneficial use of their leases from August 1994 to May 1998. Id. at 123.

The parties once again were unable to agree on damages based on the rulings to date, so we conducted a July 2001 trial in Albuquerque, limited to calculation of damages. That trial resulted in a March 2002 Order directing the Clerk to enter judgment for plaintiffs in the amount of $1,137,808 plus costs. Bass Enters. Prod. Co. v. United States, No. 95–52 (Fed.Cl. March 29, 2002).

## DISCUSSION

The basis for defendant's motion for reconsideration is this court's reliance on Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Bass, 45 Fed.Cl. at 122. "Plaintiffs have not been permitted to use their leases for a substantial period of time. Their loss during that period was absolute." Id. at 123. We noted the Supreme Court's observation that such takings are "relatively rare." Bass, 45 Fed.Cl. at 123 (quoting Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1018, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). "Yet that is exactly the situation we have here." Bass, 45 Fed.Cl. at 123. The issue on reconsideration is whether that conclusion is affected by the Supreme Court's recent decision in Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

### A. The Tahoe Decision

Tahoe Regional Planning Agency authorities imposed thirty-two-month moratoria on development near Lake Tahoe while they formulated a comprehensive land-use plan. Affected landowners sued claiming a temporary taking of their property rights. The district court ruled that plaintiffs had not established a partial taking according to the Penn Central analysis. See Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Specifically, it found that plaintiffs had not shown reasonable, investment-backed expectations in the circumstances. Tahoe, 122 S.Ct. at 1475. That ruling was not appealed to the Supreme Court. Instead, the district court ruled for plaintiffs based on a Lucas categorical takings analysis. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The court noted that the moratoria were intended to be temporary, yet the ordinance establishing them contained no date of termination. Tahoe, 122 S.Ct. at 1475–76. Consequently, it ruled the moratoria deprived plaintiffs of all economically viable use of their property, as in Lucas. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

The Supreme Court declined to apply a categorical rule, however. The Court stated that the categorical rule of Lucas is "limited to 'the extraordinary circumstance when no productive or economically beneficial use of land is permitted.'" Tahoe, 122 S.Ct. at 1483 (quoting Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). "Anything less than a 'complete elimination of value,' or a 'total loss,' ... would require the kind of analysis applied in Penn Central." Tahoe, 122 S.Ct. at 1483 (quoting Lucas, 505 U.S. at 1019–1020, n. 8, 112 S.Ct. 2886). If analyzed as a categorical taking, there would be "no need to evaluate the landowners' investment-backed expectations, the actual impact of the regulation on any individual, the importance of the public interest served by the regulation, or the reasons for imposing the temporary restriction." Tahoe, 122 S.Ct. at 1477–78.

It is important to note that the Court's consideration included the policy implications of a categorical rule in such cases, and found that it could result in government agencies' being constrained by financial considerations to the extent that they may be forced to rush through the planning process. Tahoe, 122 S.Ct. at 1487–88. Such a concern could apply in this case as well.

We agree with defendant that the Supreme Court's decision in Tahoe controls this case, and requires a balancing of the Penn Central factors. Penn Cent. Transp. Co. v.

*New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

### B. The *Penn Central* Factors

■ The Supreme Court has identified three factors that courts should examine to determine whether a regulatory taking has occurred: (1) the character of the governmental action or regulation; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with reasonable investment-backed expectations. *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

### 1. Character of the Government Action

■ Determining the character of government action requires a weighing of "the purpose and importance of the public interest reflected in the regulatory imposition" and a balancing of plaintiffs' interests against the Government's need to protect the public. *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1176 (Fed.Cir.1994). A party challenging government action in a taking bears a substantial burden. *See United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). Government regulation often "curtails some potential for the use or economic exploitation of private property" because regulation "involves the adjustment of rights for the public good." *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

Plaintiffs claim that this factor has become a question only of whether the action in which the property owner wishes to engage is a nuisance. They state that drilling for oil and gas is not a nuisance, so this factor supports their claim. The character of government action is more than a question of nuisance, however.

"[W]here the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required." *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 621 F.2d 1113, 1127 (1980). The Government was building a nuclear waste facility in this case. Determining whether drilling for oil

and gas could make the facility unstable was and is a serious public health and welfare concern. It was reasonable for the Government to insist that plaintiffs put off drilling until it could determine that drilling would not affect the stability of the WIPP nuclear repository. Government interference with plaintiffs' leases was in the public interest.

### 2. Investment–Backed Expectations

■ This criterion limits takings recoveries to plaintiffs who can establish that they "bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies,* 28 F.3d at 1177 (citations omitted). The United States conveyed the "exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas ... in the [described] lands ... together with the right to build and maintain improvements thereupon ...." Plaintiffs expected to develop and produce the oil and gas that they owned under the lease. They had "the intent and capacity to drill the eight wells for which they submitted applications to drill." *Bass Enters. Prod. Co. v. United States,* 45 Fed.Cl. 120, 122 (1999).

The Federal Government owns the surface estate and the lease by its terms is subject to federal law, defendant argues, so plaintiffs should have anticipated changes that could delay their ability to develop their leases. However, we ruled that "plaintiffs' expectations were reasonable despite regulations and lease provisions governing mining. We heard ... testimony that plaintiffs' mining plan was feasible and that the mines would be productive. Plaintiffs leased the land with reasonable investment-backed expectations of drilling ...." *Bass Enters. Prod. Co. v. United States,* 35 Fed.Cl. 615, 620 (1996).

### 3. Economic Impact

■ Plaintiffs must establish "a serious financial loss from the regulatory imposition." *Loveladies,* 28 F.3d at 1176. This showing is more commonly referred to as a denial of "economically viable use of land." *Id.* (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). The focus of this factor is on the change in fair market value of the subject property caused by the regulatory imposition.

Plaintiffs contend that denial of their applications deprived them of all economically viable use of the property for the four-year period. The adjusted cash flow for the delay period was $22.5 million. The difference between the present values of the $22.5 million with and without consideration of the delay was $2.6 million. We applied an interest factor to the lost cash flow of $2.6 million to determine fair compensation for the forty-five-month delay. Plaintiffs argue that our finding that the economic impact was $1,137,808 establishes this factor in its favor.

Defendant asserts that the issue is not the economic impact of the delay, but the entirety of the economic value. Plaintiffs are in the same situation as *Tahoe*, according to the Government. The property was still there at the end of the delay period, and looking at the property as a whole, the economic impact is not substantial.

The economic impact test is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies,* 28 F.3d at 1176. *See also Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). The court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). This factor usually is determined by a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered. *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232.

A critical question is "whose value is to furnish the denominator of the fraction." *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232 (citation omitted). The denominator in this case would be at least $22 million. The diminution in value can be measured only by the forty-five-month delay. The cost of delay was approximately $1.1 million. Using that measure, plaintiffs' economic impact is five percent of the value of their property.

## CONCLUSION

The Supreme Court decision in *Tahoe* requires that we consider the *Penn Central* factors in deciding the impact of government delay on plaintiffs' property. Plaintiffs had reasonable investment-backed expectations, but the importance of government action to public health and safety, and the negligible economic impact, negate the possibility that plaintiffs could prevail on any takings theory.

The clerk will dismiss plaintiffs' complaint. No costs.