381 F.3d 1360
 BASS ENTERPRISES PRODUCTION COMPANY; Perry R. Bass, Inc.; Lee M. Bass, Inc.; Sid R. Bass, Inc.; Thru Line, Inc.; Keystone, Inc.; Enron Oil & Gas Company (now known as EOG Resources, Inc.), Sid R. Bass, Edward P. Bass, Robert M. Bass, Lee M. Bass, and Reagan H. Legg, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 No. 03-5056.
 United States Court of Appeals, Federal Circuit.
 August 31, 2004.
 
 Appeal from the United States Court of Federal Claims, Judge Robert H. Hodges, Jr., J.
 Harold L. Hensley, Jr., Hinkle, Hensley, Shanor & Martin, L.L.P., of Roswell, NM, argued for plaintiffs-appellants. Also on the brief were James M. Hudson and Joel M. Carson, III.
 Susan V. Cook, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Thomas L. Sansonetti, Assistant Attorney General; and Kathryn E. Kovacs, Attorney, and Kristine S. Tardiff, Attorney.
 Before NEWMAN, GAJARSA, and DYK, Circuit Judges.
 GAJARSA, Circuit Judge.
 
 
 1
 Appellants Bass Enterprises Production Co., Perry R. Bass, Inc., Lee M. Bass, Inc., Sid R. Bass, Inc., Thru Line, Inc., Keystone Inc., Enron Oil & Gas Co., Sid R. Bass, Edward P. Bass, Robert M. Bass, Lee M. Bass, and Reagan H. Legg (collectively "Bass") appeal from the United States Court of Federal Claims' decision dismissing Bass's claim that the Bureau of Land Management's ("BLM") delay in approving Bass's Applications for Permits to Drill ("APD") oil and gas wells constituted a temporary taking requiring compensation from the Government. Bass Enters. Prod. Co. v. United States, 54 Fed. Cl. 400 (2002). Because the BLM's delay permitted the Government to critically evaluate whether the proposed wells would cause the release of radioactive material from an underground nuclear waste storage facility, this Court finds that the BLM's delay was not an extraordinary delay and, moreover, the Penn Central factors were not satisfied. We therefore affirm the Court of Federal Claims' dismissal of Bass's takings claim.
 
 I. BACKGROUND
 A. Bass's ADPs
 
 2
 Bass owns interests in Federal Oil and Gas Lease NMNM-02953C, which was initially conveyed by the Government to Bass's predecessors-in-interest in 1952. The current dispute concerns Bass's lease of mineral rights on 320 acres of the South Half of Section 31, Township 22 South, Range 31 East, in Eddy County, New Mexico, near Carlsbad (the "Lease"). The Lease conveys to Bass the "exclusive right and privilege to drill for, mine, extract, remove, and dispose of all oil and gas deposits except helium" in the lands covered by the Lease, subject to "all reasonable regulations of the Secretary of the Interior now or hereafter in force when not inconsistent with any express and specific provision."
 
 
 3
 In 1976, the Government withdrew approximately 17,200 acres in Eddy County from appropriation under public land laws and began to study the feasibility of a Waste Isolation Pilot Plant ("WIPP") to provide for underground storage of nuclear waste. 41 Fed.Reg. 54,994-95 (Dec. 9, 1976). Bass's Lease is located in the southwestern-most corner of the area set aside for the waste facility. Id. at 54,995.
 
 
 4
 Shortly after the land withdrawal, Bass's predecessor-in-interest filed an APD for a natural gas well, which was approved. Before drilling could commence, however, the Government condemned the first 6000 vertical feet of the Lease in order to "preserve the integrity" of the proposed waste site. In the condemnation order, the Government stated that Bass's predecessor could continue the "exploration, development, production or removal of oil and gas by way of entries other than through the aforesaid surface and initial 6,000 feet of subsurface." Ultimately, in 1982, the owners of the Lease at that time drilled a directional natural gas well outside the condemned property that reached under the WIPP site at a depth below 6,000 feet. Bass acquired its interests in the Lease after the directional well had been drilled.
 
 
 5
 In 1992, Congress passed the Waste Isolation Pilot Plant Land Withdrawal Act (the "WIPP Act"), which established a process for opening the storage facility to receive hazardous waste. Pub.L. No. 102-579, 106 Stat. 4777 (1992).
 
 
 6
 The WIPP Act required considerable interagency coordination to permit the site to open. First, the WIPP Act required the Environmental Protection Agency (the "EPA") to promulgate disposal and operational regulations for the facility as well as criteria for judging compliance with such regulations. WIPP Act § 8(b)-(c). Next, the Department of Energy ("DOE") was to submit an application to the EPA outlining how it would comply with the EPA's regulations. Id. § 8(d). Finally, the EPA was to review the DOE's application and determine whether the facility could be certified and opened for storage of nuclear waste. Id. § 7(b).
 
 
 7
 As part of the certification decision, the EPA was also required to consult with the DOE and the Secretary of the Interior to consider whether Bass's Lease should be acquired to ensure the safety of the waste storage site. Id. § 4(b)(5), § 7(b)(4). The WIPP Act prohibited all manner of mining or oil and gas production, including slant drilling, that could affect the WIPP site with the exception of Bass's rights under its Lease. With respect to the Lease, the WIPP Act established a consultative process to evaluate whether to condemn Bass's property:
 
 
 8
 (5) MINING.—
 
 
 9
 (A) IN GENERAL.—Except as provided in subparagraph (B), no surface or subsurface mining or oil or gas production, including slant drilling from outside the boundaries of the Withdrawal, shall be permitted at any time (including after decommissioning) on lands on or under the Withdrawal.
 
 
 10
 (B) EXCEPTION.—Existing rights under Federal Oil and Gas Leases No. NMNM 20953 and No. NMNM 02953C [the Lease] shall not be affected unless the Administrator determines, after consultation with the Secretary and Secretary of the Interior, that the acquisition of such leases by the Secretary is required to comply with the final disposal regulations or with the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.).
 
 
 11
 Id. § 4(b)(5) (emphasis added). The WIPP Act did not otherwise change the administrative process associated with receiving a drilling permit. The BLM remained responsible for issuing ADPs until the EPA made a determination as to whether condemnation would be required. To effectuate the purposes of the WIPP Act, however, BLM entered into a series of memoranda of understanding ("MOUs") with the DOE relating to the BLM's permitting procedures on or near the nuclear waste disposal site.
 
 
 12
 In March 1993, inspired by the passage of the WIPP Act and the possible threat that the Secretary would acquire its Lease pursuant to the WIPP Act, Bass filed eight ADPs to drill directional oil wells that would reach below 6000 surface feet and extract oil from underneath the area covered by the WIPP Act. Upon receiving the ADPs, the BLM contacted the DOE pursuant to the first MOU between the agencies. The MOU required the BLM to (1) withhold approval of ADPs until it received comments from the DOE and (2) not approve any ADP that may "affect the integrity of the WIPP site." After being put on notice of Bass's ADPs, the DOE notified the EPA of the proposed wells, noting that the grant of the ADPs "may have long-term ramifications, if not addressed thoroughly."
 
 
 13
 In May 1994, the DOE notified the BLM that, while both the EPA and the DOE had not found any indication that the wells would impact the waste facility, the EPA had not yet determined whether to acquire the Lease pursuant to the WIPP Act. The DOE therefore requested that the BLM delay its ADP decision until the EPA was able to make an informed decision regarding the need for condemnation.
 
 
 14
 In July 1994, the BLM circulated an internal document recommending that the ADPs be approved. By the end of the month, however, the BLM reconsidered its position and recommended denial of the ADPs because of new concerns over reinjection wells and water flooding for secondary recovery. In addition, BLM had signed a new MOU with the DOE that emphasized the importance of preserving the WIPP site.
 
 
 15
 On August 22, 1994, the BLM wrote to Bass and denied the ADPs "at this time," because the EPA had not yet made a decision on the acquisition of Bass's leasehold. Bass filed an action for damages in the Court of Federal Claims in January 1995. After Bass filed its action, on August 9, 1995, the BLM sent a Supplemental Decision letter to Bass indicating that, although the prior denial had been final for purposes of appeal, it was willing to reconsider the ADPs once the EPA certified that drilling would not conflict with the WIPP regulations.
 
 
 16
 Bass's ADPs were ultimately approved in May 1998, forty-five months after the ADPs were initially denied by the BLM. BLM's approval issued shortly after the EPA published its final decision certifying the DOE's application for the WIPP and finding that the Lease did not need to be acquired to comply with safety regulations.
 
 B. Takings Litigation
 
 17
 In 1996, the Court of Federal Claims entered judgment in favor of Bass, finding a final denial of the ADPs and a permanent taking of Bass's leasing rights. Bass Enters. Prod. Co. v. United States, 35 Fed. Cl. 615 (1996). At that time, however, the EPA had not yet determined whether to condemn the Lease under Section 4(b)(5)(B) of the WIPP Act. On appeal, we reversed the Court of Federal Claims' finding of a permanent taking. We held that Congress established a mechanism for condemning the Lease under the WIPP Act and that, until the EPA rendered its final decision as to condemnation, the final denial of the ADPs would not constitute a permanent taking. We then remanded the case for consideration of whether a temporary taking had occurred. Bass Enters. Prod. Co. v. United States, 133 F.3d 893 (Fed.Cir.1998).
 
 
 18
 After the BLM approved Bass's permits in 1998, the only issue remaining on remand was whether the BLM's delay in issuing the ADPs effected a compensable temporary taking. Bass claimed compensation for only the forty-five month delay between the BLM's denial of the permits and their subsequent approval.
 
 
 19
 In evaluating Bass's temporary takings theory, the Court of Federal Claims initially found in favor of Bass and awarded damages in the amount of $1,137,808. Bass Enters. Prod. Co. v. United States, 45 Fed. Cl. 120 (1999); Bass Enters. Prod. Co. v. United States, 48 Fed. Cl. 621 (2001); Bass Enters. Prod. Co. v. United States, No. 95-52L (Fed.Cl. Apr. 29, 2002) (order setting damages). In this determination, the Court of Federal Claims held that Bass had been denied all beneficial use of the property during the delay period and thus that the taking was a per se, categorical taking requiring compensation under the Supreme Court's decision in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Bass, 45 Fed. Cl. at 123. The damage calculation was derived from "the interest earned on the oil and gas profits" that would have been received during the delay period.
 
 
 20
 The Government filed a Motion for Reconsideration after the Supreme Court's decision in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Bass, 54 Fed. Cl. at 402. In Tahoe-Sierra, the Supreme Court stated: "Anything less than a `complete elimination of value,' or a `total loss,' ... would require the kind of analysis applied in Penn Central." Tahoe-Sierra, 535 U.S. at 330, 122 S.Ct. 1465. Analogizing the moratorium on building development in Tahoe-Sierra to the BLM's delay in approving the ADP, the Court of Federal Claims held that it should apply a Penn Central analysis instead of categorically finding a taking based on the BLM's permitting delay. Bass, 54 Fed. Cl. at 402-03.
 
 
 21
 The Court of Federal Claims therefore looked to (1) the character of the government action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with reasonable investment-backed expectations. See Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124-25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). While acknowledging that Bass "had reasonable investment-backed expectations," the court found that the economic impact on Bass was de minimis and that the Government's delay was reasonable given the importance of protecting the public from the possible release of radioactivity. Bass, 54 Fed. Cl. at 403-04. Weighing the factors and the circumstances surrounding the delay as a whole, the Court of Federal Claims concluded that BLM's delay did not create a temporary taking and dismissed Bass's complaint. Id. Bass filed a timely appeal to this Court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
 
 II. DISCUSSION
 A. Standard of Review
 
 22
 When reviewing a final decision by the Court of Federal Claims, we examine the court's legal determinations de novo and its findings of fact for clear error. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed.Cir.2001); Whitney Benefits v. United States, 926 F.2d 1169 (Fed.Cir.1991). Whether a taking that is compensable under the Fifth Amendment has occurred is a question of law that is based on factual determinations. Wyatt v. United States, 271 F.3d 1090, 1096 (Fed.Cir.2001); Alves v. United States, 133 F.3d 1454, 1456 (Fed.Cir.1998).
 
 B. Use of Lucas Test
 
 23
 Under the Fifth Amendment to the United States Constitution, private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. Supreme Court precedent has long recognized that a taking can be accomplished by a physical invasion of the property or by the imposition of a governmental regulation. Lucas, 505 U.S. at 1014-15, 112 S.Ct. 2886; Penn. Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In the case of physical possession by the Government where there is economic damage to the owner, compensation is always due to the owner regardless of whether the taking was of only part of the property or of the property as a whole. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951). When the alleged taking is a result of regulation, however, a court must typically conduct a complex factual assessment to determine whether compensation is owed to the property holder. Yee v. City of Escondido, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). A per se categorical rule is applied to regulatory takings only in the extraordinary circumstance "when no productive or economically beneficial use of land is permitted." Lucas, 505 U.S. at 1017, 112 S.Ct. 2886. In Tahoe-Sierra, the Supreme Court clarified that the rule applied in Lucas would only be applicable to permanent, rather than temporary, regulatory takings, stating that "Lucas carved out a narrow exception to the rules governing regulatory takings for the `extraordinary circumstance' of a permanent deprivation of all beneficial use." 535 U.S. at 542 n. 19, 122 S.Ct. 1646 (emphasis added).
 
 
 24
 Because Bass alleges a temporary regulatory taking, the Court of Federal Claims properly eschewed the use of a per se categorical rule such as that imposed in Lucas. The appellants submitted two separate theories as to why there has been a temporary taking. First, they argue that, even if action on the permit applications was merely delayed and not denied, they should be compensated because there was extraordinary delay, and the Penn Central factors have been satisfied. Second, they argue that the applications were denied (and then granted); that under our decision in Boise Cascade v. United States, 296 F.3d 1339 (2002), a showing of extraordinary delay is not required where a permit has been denied; and that application of the Penn Central factors shows that a temporary taking occurred. Neither theory establishes a compensable taking on the facts of this case.
 
 C. Extraordinary Delay
 
 25
 In the present case, Appellants allege that the BLM's forty-five month delay in making its permitting decision constituted a temporary regulatory taking compensable under the Fifth Amendment. We reject Bass's argument.
 
 
 26
 In reviewing the Court of Federal Claims' decision, we first must emphasize that the evaluation of regulatory takings is an "essentially ad hoc" process. Penn Central, 438 U.S. at 124, 98 S.Ct. 2646. The Supreme Court's jurisprudence counsels the courts to weigh all of the relevant circumstances in context to determine whether a taking has occurred. Palazzolo v. Rhode Island, 533 U.S. 606, 636, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring).
 
 
 27
 When looking at a regulatory action by the Government, the Supreme Court has noted that "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Mahon, 260 U.S. at 413, 43 S.Ct. 158. The requirement that a property owner obtain a permit to undertake a particular use of his land therefore does not in and of itself constitute a compensable taking. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126-27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Moreover, as the Supreme Court emphasized in Tahoe-Sierra, "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like" have "long been considered permissible exercises of the police power" and are therefore noncompensable under the Fifth Amendment. 535 U.S. at 335, 122 S.Ct. 1465 (emphasis added).
 
 
 28
 A taking may result, however, when an "extraordinary delay in governmental decisionmaking" occurs. Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 800 (Fed.Cir.1993). The Supreme Court, as well as our own court and other sister circuits, have recognized that "extraordinary delays" typically last for a substantial length of time. See, e.g., Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (finding no temporary taking despite eight year delay); Wyatt v. United States, 271 F.3d 1090 (Fed.Cir.2001) (same for seven year delay); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 216 F.3d 764 (9th Cir.2000) (same for forty month delay).
 
 
 29
 The question of whether a delay is extraordinary is not a simple matter of the number of months or years taken by the Government to make its decision however. In Tahoe-Sierra, the Supreme Court rejected bright-line proposals that would have made a Governmental delay longer than a fixed number of years, such as more than six, compensable under the Takings Clause. 535 U.S. at 333, 337-38, 122 S.Ct. 1465. Instead of such an easy guidepost, courts must evaluate a number of factors to determine whether the delay is extraordinary. First, the Supreme Court has stated that it will be rare for a court to find an extraordinary delay in the absence of bad faith by the Government. Tabb Lakes, 10 F.3d at 799. In addition, our Court in Wyatt also recognized that, since "delay is inherent in complex regulatory permitting schemes," we should examine "the nature of the permitting process as well as the reasons for any delay" to determine if the delay is disproportionate to the regulatory permitting scheme from which it arises. 271 F.3d at 1098. As we explained in Wyatt: Complex regulatory schemes often require detailed information before the issuance of a permit. The nature of the regulatory scheme is especially critical when the permitting process requires detailed technical information necessary to determine environmental impacts. Governmental agencies that implement complex permitting schemes should be afforded significant deference in determining what additional information is required to satisfy statutorily imposed obligations.
 
 
 30
 Id. Our precedent thus requires that we examine the reasons for the Government's delay, including the regulatory scheme imposed upon the Government under the WIPP Act, in order to assess extraordinary delay.
 
 
 31
 In the present appeal, the district court determined that the Government's delay was reasonable given the possibility that the drilling proposed by Bass could substantially impact the underground nuclear waste facility and thereby endanger the health and safety of the surrounding community. The Court of Federal Claims found neither extraordinary delay nor bad faith in the Government's attempt to properly evaluate the potential impact of oil and gas wells under a nuclear waste site. The Court's factual findings to this respect are well supported.
 
 
 32
 In arguing that the delay was extraordinary and hence compensable, Bass insists that the BLM impermissibly consulted with the DOE and the EPA in making its drilling decision. According to Bass, only BLM's technical review and approval was required for the issuance of the permits. Bass's argument fails to appreciate that the WIPP Act added an additional layer of complex decisionmaking atop of the BLM's existing duty to review drilling permits.
 
 
 33
 With respect to the Lease on the WIPP site, Congress required the EPA to determine whether condemnation would be required, a decision contingent on the final disposal and operating regulations for the facility. These regulations were not yet in place; the EPA had to develop such safety regulations subject to the standard notice and comment procedure for agency rulemaking. Congress therefore required the EPA to promulgate the criteria by which drilling activities near the WIPP Act could be evaluated, 61 Fed.Reg. at 5229 (Feb. 9, 1996), and then evaluate whether Bass's activities could endanger the success of the facility. Further, Congress required the EPA to consult with the DOE and the Secretary of the Interior regarding the effect that drilling activities on the Lease property may have on the WIPP facility. The BLM's decision to evaluate permits relating to the WIPP site with the guidance of the EPA and the DOE helped to effectuate the purposes of the WIPP Act and was therefore permissible.
 
 
 34
 Furthermore, given that the BLM was faced with a possible environmental and health hazard, we do not want to "encourage hasty decisionmaking" by the Government. Bass underemphasizes the importance of ensuring the safety of the nuclear waste facility developed under the WIPP Act. The WIPP facility became the first certified permanent radioactive waste facility in the world when it opened in 1999. Dep't of Energy, Waste Isolation Pilot Plant, at http://www.wipp.ws (last visited Aug. 19, 2004). Prior to the construction of the WIPP facility, radioactive waste was stored in temporary metal containers in Colorado, Idaho, New Mexico, Nevada, Ohio, South Carolina, Tennessee, and Washington. The WIPP facility was designed to provide for the safe and permanent disposal of up to 6.2 million cubic feet of nuclear waste, with a goal of isolating the waste for a period of 10,000 years. The disposal system is located over 2000 feet below ground in an underground natural salt formation. The site was selected not only because of the natural advantages of the salt, which can mold around the disposal system, but also specifically because the site lacked artificial intrusions such as oil, gas, and water wells. S.Rep. No. 102-196, at 17 (1991).
 
 
 35
 Given the critical importance of the decision relating to the issuance of the ADPs and the complexity of the decisionmaking process established under the WIPP Act, the BLM's delay does not constitute an "extraordinary delay." Bass's ADPs were submitted in April 1993, just six months after the passage of the WIPP Act. On April 26, 1993, the BLM forwarded the ADPs to the DOE for comment. Two months later, the DOE responded that the EPA should also be consulted. The DOE then contacted the EPA to formally request the EPA's views. By October 1993, the EPA had requested additional time from the DOE to evaluate the need for acquiring the Lease.
 
 
 36
 In the meantime, the EPA proceeded to publish general regulations governing the disposal of waste in the facility. 58 Fed.Reg. 7924 (Feb. 10, 1993). After notice and comment, the disposal regulations issued December 20, 1993. 58 Fed.Reg. 66,398 (Dec. 20, 1993). More specific regulations relating to the criteria for certifying the facility were then published in January 1994; these criteria were in preliminary form. 58 Fed.Reg. 8029 (Feb. 11, 1993).
 
 
 37
 In May 1994, the EPA repeated its request to the DOE for additional time regarding Bass's ADPs, stating that "a final determination on a matter of this importance should wait until all the facts are available." In light of the EPA's request, DOE asked BLM to delay its permitting decision. On August 22, 1994, BLM denied the permits on the basis of the EPA's reluctance to accelerate its decisionmaking process.
 
 
 38
 In early 1995, the DOE submitted a draft Compliance Certification Application ("CCA") to the EPA relating to the proposed use of the WIPP facility. The EPA then issued the final criteria on February 9, 1996, relating to the WIPP facility, including a listing of the specific requirements necessary to assess drilling activities near the WIPP site. 61 Fed.Reg. at 5229. The EPA and the DOE continued to work towards preparing the site for opening, with the DOE amending its CCA in October 1996 and again in May 1997. Once the CCA was completed, the EPA began a final technical review for compliance and also completed its analysis of the impact that drilling could have on the WIPP site. On October 30, 1997, less than five months after the final CCA was submitted to it, the EPA published a notice of its proposed decision to certify the WIPP site. 62 Fed.Reg. 58,792 (Oct. 30, 1997). In this notice, the EPA also proposed that the Lease would not need to be acquired to limit drilling near the WIPP facility. Id. On May 18, 1998, the EPA published its final decision certifying the WIPP facility to begin receiving waste. The EPA also determined that the Bass lease would not need to be condemned. According to the EPA, "potential activities at these existing leases would have an insignificant effect on releases of radioactive material from the WIPP disposal system, and thus, they do not cause the WIPP to violate the disposal regulations." 63 Fed.Reg. 27,354, 27,356 (May 18, 1998). Within the month, BLM approved Bass's ADPs. Unlike Bass, we do not agree that the Court of Federal Claims clearly erred in its determination that the BLM's delay was reasonable. See Boise Cascade, 296 F.3d at 1352; Wyatt, 271 F.3d at 1098; see also Tahoe-Sierra, 535 U.S. at 333, 122 S.Ct. 1465.
 
 D. Character of the Government's Action
 
 39
 The Court of Federal Claims properly applied the Penn Central factors and concluded that they were not satisfied. In its appeal, Bass also argues that the Court of Federal Claims committed clear legal error in its analysis of the "character of the Government action" under Penn Central. According to Bass, the Court of Federal Claims should not have looked at whether the government's delay was designed to promote public safety, health, and welfare. Instead, Bass argues that the Supreme Court's decision in Lucas limits the "character of the Government action" factor to an analysis of whether the Government's regulation was designed to proscribe a nuisance. Under Bass's theory, if the Government's action was not directed to a nuisance, then the "character of the Government action" factor of Penn Central weighs in favor of the property owner. Following this logic, Bass argues that, because oil and gas exploration is not a public nuisance, the Court of Federal Claims improperly considered the concerns for public welfare in its Penn Central analysis and should have found that the "character of the Government action" factor favors Bass.
 
 
 40
 We reject the Appellants' position. In our earlier decision of Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1179 (Fed.Cir.1994), which was decided prior to Tahoe-Sierra and Palazzolo, we stated that Lucas caused a "sea change" that removed the weighing of public versus private interests in determining whether a taking has been effected. Using Lucas as our guide, we held that federal courts were to replace the ad hoc process method of evaluating the Government's actions and instead utilize the more familiar and predictable doctrines associated with nuisance laws. Loveladies Harbor, 28 F.3d at 1179. We interpreted Lucas to hold that "if the imposed restraint would have been justified under the state's traditional nuisance law, then the property owner's bundle of rights did not include the right claimed, and no taking could occur." Id.
 
 
 41
 We later affirmed this position in 2000. In Palm Beach Isles Associates v. United States, we explained that the Government could "defend" itself from a regulatory takings claim only if it could articulate "background principles ... that prohibit the uses [the landowner] now intends." 208 F.3d 1374, 1385 (Fed.Cir.2000).
 
 
 42
 In 2001, however, the Supreme Court limited the applicability of Lucas to regulatory takings in its decision of Palazzolo. The Palazzolo majority noted that, under Lucas, "total" or permanent regulatory takings required compensation unless the regulation proscribed a nuisance, but a partial regulatory taking triggered an analysis of the complex factors associated traditionally with Penn Central. 533 U.S. at 615-16, 618, 121 S.Ct. 2448. In her concurrence in Palazzolo, Justice O'Connor further explained that courts should resist "the temptation to adopt what amount to per se rules" and instead conduct a "careful examination and weighing of all the relevant circumstances." Id. at 636, 121 S.Ct. 2448 (emphasis added). In particular, the Justice noted that courts were permitted to look to the public purposes served by the Government's regulatory actions:
 
 
 43
 We have "identified several factors that have particular significance" in these "essentially ad hoc, factual inquiries." Penn Central, 438 U.S. at 124, 98 S.Ct. 2646. Two such factors are "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Ibid. The purposes served, as well as the effects produced, by a particular regulation inform the takings analysis. Id. at 127 ("[A] use restriction on real property may constitute a `taking' if not reasonably necessary to the effectuation of a substantial public purpose, [citations omitted], or perhaps if it has an unduly harsh impact upon the owner's use of the property").... Penn Central does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required.
 
 
 44
 Palazzolo, 533 U.S. at 633-34, 121 S.Ct. 2448 (emphasis added). Palazzolo therefore returned the temporary takings pendulum back to the familiar Penn Central analysis that existed prior to Lucas.
 
 
 45
 The Supreme Court's decision in Tahoe-Sierra further stressed that a gestalt approach should be used when evaluating all of the Penn Central factors, including the "character of the Government action" factor. Tahoe-Sierra, 535 U.S. at 330, 122 S.Ct. 1465. Echoing Justice O'Connor's concurrence in Palazzolo, the Supreme Court stated that regulatory takings should be evaluated using "essentially ad hoc, factual inquiries" designed to permit full examination of the relevant circumstances. Tahoe-Sierra, 535 U.S. at 322, 122 S.Ct. 1465. As for the "character of the Government action" factor, the Tahoe-Sierra Court advocated an examination of the "purpose and economic effect" of the government's actions. Id. at 323, 122 S.Ct. 1465 (emphasis added). In its decision, the Supreme Court also noted that the Government's traditional regulatory actions, such as those involving zoning, permits, moratoria, and other land-use provisions, as well as those affecting safety, often do not constitute takings if done so within a reasonable timeframe. Id. at 329., 122 S.Ct. 1465
 
 
 46
 Based on Palazzolo and Tahoe-Sierra, our recent decisions mark a return to the pre-Lucas evaluation of the "character of the Government actions" factor. We therefore consider the purpose of the regulation and its desired effects in determining whether a taking has occurred. For example, in Maritrans Inc. v. United States, we explained that a court should "consider the purpose and importance of the public interest underlying a regulatory imposition" in its Penn Central analysis. 342 F.3d 1344, 1356 (Fed.Cir.2003). We thus required the court to inquire "`into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.'" Id. (quoting Creppel v. United States, 41 F.3d 627, 631 (Fed.Cir.1994)). Our analysis in Maritrans incorporates the recent mandates by the Supreme Court.
 
 
 47
 In conducting a full review of "all relevant circumstances" surrounding the alleged taking by the Government, we again hold that a court may examine the relative benefits and burdens associated with the regulatory action. Based on our precedent and that of the Supreme Court, the Court of Federal Claims therefore did not commit legal error by considering the potential impact on the public when it evaluated whether the BLM's delay in permitting drilling near a nuclear waste site constituted a taking.
 
 III. CONCLUSION
 
 48
 We have considered Bass's other arguments and find them unpersuasive. Based on the important and critical nature of the permitting decision and the required procedures to make the decision, we find more than adequate support for the Court of Federal Claims' determination that the BLM's forty-five month delay was reasonable and therefore not an "extraordinary" delay, and it properly concluded that the Penn Central factors were not satisfied. The Court of Federal Claims' judgment that the Government's delay did not rise to the level of a compensable taking is therefore
 
 
 49
 
 AFFIRMED.
 
 
 
 COSTS
 
 
 50
 No costs.