**BASS ENTERPRISES PRODUCTION CO., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 95–52 L.

United States Court of Federal Claims.

Oct. 12, 1999.

---

EPA's role was to decide whether environmental dangers existed, and if so to advise the Department of Energy that it should condemn the leases in federal district court. BLM was not dependent on or bound by such review by EPA.

On appeal, the Federal Circuit ruled that a permanent taking could not have occurred because Congress "mandated [an] end to the regulatory process [which] will result in a decision whether or not to condemn the leases." *Bass Enterprises Production Co. v. United States,* 133 F.3d 893, 896 (Fed.Cir. 1998). It remanded the case to the trial court to determine whether plaintiffs suffered a temporary taking.

## DISCUSSION

Defendant takes the position on remand that the dispositive issue in a temporary takings analysis is whether an extraordinary delay occurred in the regulatory process. If so, did such delay deprive plaintiffs of substantially all economically viable use of their property during the temporary taking period. Specifically, the question posed by defendant was whether BLM's delay until EPA ruled on condemnation was unreasonable.

Plaintiffs argued that such a standard does not apply here, and they did not offer any evidence of unreasonable delay. Rather, "BLM'[s] decision to prohibit development of plaintiffs' lease despite its exemption under the WIPP[2] Land Withdrawl Act... resulted in the United States' de facto acquisition of plaintiffs' property for the sole public purpose of protecting the integrity of the WIPP site." Thus, the taking occurred when BLM, the only agency authorized to act on plaintiffs' applications, denied them. We characterized the argument as a per se temporary regulatory taking.

### A. The Regulatory Process

The Federal Circuit held that "denial of the permits is at best a temporary taking. The statutorily mandated end to the regulatory process will result in a decision whether or not to condemn the leases." *Bass,* 133

Harold L. Hensley, Jr. and Karolyn K. Nelson, Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., Roswell, New Mexico, for plaintiffs.

Marc A. Smith and Kristine S. Tardiff, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

We ruled in a May 1996 Opinion and Order that plaintiffs' oil and gas leases were taken permanently by the United States when the Bureau of Land Management denied their application to drill "at this time."[1] BLM informed plaintiffs that the denial was a final appealable decision. After plaintiffs filed suit in this court, BLM issued a "supplemental decision" stating that it was "prepared to give [the] proposal further consideration when the EPA has certified DOE compliance with its solid transuranic waste disposal regulations." BLM said it did not necessarily mean that the earlier ruling was final.

[1]. The facts are set out in *Bass Enterprises Production Co. v. United States,* 35 Fed.Cl. 615 (1996).

[2]. Waste Isolation Pilot Plant.

F.3d at 896. The Federal Circuit recognized that plaintiffs' applications were denied, not just delayed.

The record in this case establishes that the permitting process was completed. Bass could take no other steps to obtain approval of its applications. The denial letter issued in May 1994 stated that "DOE requested BLM delay any decisions until after December 1996...." BLM found it "necessary to deny approval of [the] eight proposed wells, at this time." Defendant cannot escape the consequences of a permit denial by using the phrase, "at this time." BLM had three options after review of plaintiffs' permits. It could deny the permits, grant the permits, or delay action. *Bass,* 35 Fed.Cl. 615, 618 (1996). BLM chose to deny the permits. The denials were an absolute prohibition of plaintiffs' right to possess, use, and dispose of the oil and gas under the lands subject to the lease.

BLM had final decision-making authority over Bass' applications.[3] EPA's role was to evaluate whether the WIPP site complied with EPA's standards for the disposal of radioactive waste. EPA had nothing to do with oil and gas development or Bass' applications for development. EPA's process of determining whether to certify the WIPP site was a separate regulatory process, leading to a decision of whether to recommend that the Department of Energy condemn plaintiffs' leases in an eminent domain proceeding.

### B. Temporary Takings Analysis

■ To prevail on a temporary takings theory, plaintiffs must demonstrate that but for the Government's action, they would have undertaken development efforts. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1033, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (Kennedy, J., concurring) (petitioner must have had the intent and capacity to develop the property and failed to do so because the State prevented him). These plaintiffs intended to develop the subject property when they submitted their applications to the Bureau of Land Management.

The Division Production Manager for Bass Enterprises testified that Bass was ready to drill the wells. The Exploration Department approved geological prognoses that "illustrate our readiness to drill these wells." He admitted that the approval was not final, but rather "essential approval ... to drill the well." These prognoses were sent to the Texas Division Manager and then to the Drilling Group for preparation of the applications to drill.

Defendant argued at trial that plaintiffs were not ready to drill the wells because the Authorization for Expenditure form was not filled out. This is an internal Bass document that is used to signify final management approval of the project. The Division Production Manager stated, however, that he did not ask his staff to start the authorization for expenditure process because he was unsure of the time it would take to get approval for the applications to drill. He testified that there were indications that the locations would be productive. Bass "had the staff.... the money.... All we needed was the authority...." Plaintiffs had the intent and capacity to drill the eight wells for which they submitted applications to drill.

■ The Supreme Court set out two categories of regulatory action that are compensable "without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886. The first is regulations that cause a property owner to suffer a physical invasion of his property. *Id.* The second is regulations that deny a landowner all economically beneficial or productive use of his land. *Id.; See also Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). "[T]he Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests *or* denies an owner economically viable use of his land.'" *Lucas,* 505 U.S. at 1016, 112 S.Ct. 2886 (emphasis added) (quoting *Agins,* 447 U.S. at 260, 100 S.Ct. 2138).

---

3. We asked BLM's District Manager whether BLM could have approved plaintiffs' applications irrespective of what DOE or EPA wanted. She testified that BLM had "ultimate authority to do that."

Bass' property interest was a federal oil and gas lease issued pursuant to the Mineral Leasing Act of 1920. Under the terms of the lease, Bass had the "exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the ... lands ... together with the right to build and maintain improvements thereupon...." Yet plaintiffs could not undertake any activity on the property after BLM denied the permits. They were denied all economically beneficial use of their leases during that period. Plaintiffs may be able to develop the land now, but that does not compensate them for the lost years. *See Lucas*, 505 U.S. at 1032, 1033, 112 S.Ct. 2886 (Kennedy, J., concurring).

Plaintiffs' leases were exempt from the WIPP Land Withdrawl Act.[4] If EPA ultimately had decided to purchase the leases, this would have been done through a condemnation proceeding.[5] The Government did not know at trial when EPA would make a decision on certification. Plaintiffs' hands were tied.

After the first trial and appeal, EPA issued a final determination certifying that the WIPP site complied with all of EPA's standards for disposal of radioactive waste. It was not necessary to condemn the leases. BLM is now willing to accept plaintiffs' applications and begin processing them. The taking period concluded on May 28, 1998. Plaintiffs were denied all use of their property from August 22, 1994 until May 28, 1998 when BLM agreed to accept plaintiffs' applications.[6]

"[T]otal deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas*, 505 U.S. at 1017, 112 S.Ct. 2886. Situations in which a property owner is deprived by regulation of all economic beneficial uses are "relatively rare." *Id.* at 1018, 112 S.Ct. 2886. Yet that is exactly the situation we

have here. While the taking may not be permanent, it is a taking. Plaintiffs have not been permitted to use their leases for a substantial period of time. Their loss during that period was absolute. If deprivation of property during an interim period is a taking, "its limited duration will not bar constitutional relief. It is well established that temporary takings are as protected by the Constitution as are permanent ones." *Lucas*, 505 U.S. at 1033, 112 S.Ct. 2886 (Kennedy, J., concurring) citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

## DAMAGES

Prior to the trial on remand, the parties asked that the court enter an Order establishing the appropriate standard to use in valuation of the alleged temporary taking. We agreed to rule on the measure of damages to facilitate the parties' settlement efforts. These efforts failed and we proceeded to trial. The Order stated that "[t]he measure of compensation for a temporary taking is the fair rental value of the property for the period of the taking." *See Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed.Cir.1990); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

The facts of this case are unique, however. Plaintiffs' leases allow them to "drill for, mine, extract, remove and dispose of *all* the oil and gas...." May 1, 1952 Lease (emphasis added). They have the right to extract the oil and gas until it is depleted. Plaintiffs were prohibited from developing their property during the relevant period, but the oil and gas remains in the ground and may be extracted once drilling is permitted.

In *Kimball Laundry* however, the United States temporarily took an existing laundry business for use in the war effort. *Kimball*

---

4. Section 4(b)(5) of Public Law 102–579 states in part: "(B) EXCEPTION.—Existing rights under Federal Oil and Gas Leases No. NMNM 02953 and No. NMNM 02953C shall not be affected unless the Administrator determines ... that the acquisition of such leases ... is required to comply with the final disposal regulations or with the Solid Waste Disposal Act...." Waste Isolation

Pilot Plant Land Withdrawl Act, Pub.L. 102–579, 106 Stat. 4777 (Oct. 30, 1992).

5. District courts have original jurisdiction of all condemnation proceedings. 28 U.S.C. § 1358.

6. The parties agree that if a taking occurred this is the applicable period.

*Laundry Co.,* 338 U.S. at 3, 69 S.Ct. 1434. The Supreme Court determined that the proper damage measure was the rental value of the laundry that probably could have been obtained. Kimball Laundry lost the use of its business during the taking period and could never recoup that loss. In contrast, Bass has not lost any of the oil and gas. "[S]ince the property is returned to the owner when the taking ends, the just compensation to which the owner is entitled is the value of the use of the property during the temporary taking, i.e., the amount which the owner lost as a result of the taking." *Yuba,* 904 F.2d at 1580, 1581 (citing *First English,* 482 U.S. at 319, 107 S.Ct. 2378.)

We cannot award plaintiffs a royalty interest, or the present value of the income stream. Both calculations would lead to a double recovery. Plaintiffs' damages are measured by the interest they would have earned on the oil and gas profits during the period of delay.[7]

### CONCLUSION

Plaintiffs suffered a temporary taking of their property. They lost all economically viable use of their leases for almost 4 years. We ask that the parties stipulate damages based on the above rulings within 30 days.

---

**7.** *See* Ruling on Measure of Damages dated July 14, 1998.