**CENTURY EXPLORATION NEW ORLEANS, INC., Plaintiff,**

and

**Champion Exploration, LLC, Third–Party Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 11–54 C.

United States Court of Federal Claims.

Jan. 24, 2012.

Richard K. Leefe, Metairie, LA, for plaintiff Century Exploration New Orleans, Inc. Michael R. Gelder, Metairie, LA, of counsel.

Guy E. Wall, New Orleans, LA, for plaintiff Champion Exploration, LLC.

Gregg M. Schwind, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Steven J. Gillingham, Assistant Director, and Nelson R. Richards, Trial Attorney, Washington, DC, for defendant.

1. The facts recounted here are largely taken from the initial complaint in this case and are undisputed unless otherwise noted. The court makes no findings of fact in this opinion.

2. In May 2010, the Secretary of the Interior announced that MMS would be split into three separate agencies: the Bureau of Safety and Environmental Enforcement (BSEE), the Bureau of Ocean Energy Management (BOEM), and the Office of Natural Resources Revenue (ONRR).

## OPINION

BUSH, Judge.

Now pending before the court is defendant's motion for joinder or, in the alternative, to dismiss, which has been fully briefed and is ripe for a decision by the court. Because plaintiffs are not precluded from pursuing a takings claim under the Fifth Amendment and a breach of contract claim in the same suit, defendant's motion to dismiss Count II of plaintiffs' complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) is denied. Furthermore, because Champion Exploration, LLC (Champion) is now a party to this suit, defendant's motion for joinder is denied as moot.

## BACKGROUND[1]

### I. Factual Background

The United States, acting through the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) within the Department of the Interior (DOI), is the defendant in this case. BOEMRE is charged with managing the nation's energy resources, including resources under the submerged lands of the Outer Continental Shelf (OCS) in the Gulf of Mexico and in other United States waters. BOEMRE is responsible for the administration of mineral leases on the OCS, as well as the regulation of mineral exploration and production activities on the OCS. BOEMRE was formerly the Minerals Management Service (MMS).[2]

On July 8, 2008, plaintiffs entered into an oil-and-gas lease for 5760 acres of submerged land on the OCS in the Gulf of Mexico pursuant to the Outer Continental Shelf Lands Act

DOI Secretarial Order No. 3299 (May 19, 2010). In June 2010, MMS was renamed BOEMRE. DOI Secretarial Order No. 3302 (June 18, 2010). The revenue-collection functions of BOEMRE were transferred to ONRR in October 2010, and BOEMRE was then divided into two new agencies, BSEE and BOEM, in October 2011. *See* Direct Final Rule, 76 Fed.Reg. 64432–01 (October 18, 2011).

(OCSLA), 43 U.S.C. §§ 1331–1356 (2006).[3] The lease had an effective date of August 1, 2008, with an initial term running through July 31, 2013, and for as long thereafter as oil and gas are produced from the leased area in paying quantities, or while approved drilling or well re-working operations are conducted on the submerged land, or for as long as otherwise provided by regulation.

Plaintiffs paid the government $23,236,314 to acquire the lease, plus additional lease rental payments of $9.50 per acre, per lease year, for a total of $164,160 in rental payments from August 1, 2008 through January 25, 2011. Under the lease, the government was also entitled to a specified percentage of the estimated or market value of the oil and gas produced on the leased area as royalty payments, subject to a minimum royalty payment of $9.50 per acre, per lease year.

On December 22, 2008, plaintiffs submitted their Initial Exploration Plan (IEP) for the lease to MMS. *See* Compl. Ex. B. The IEP contemplated the drilling and completion of five separate wells (Wells 1 through 5) on the leased area. In accordance with the Coastal Zone Management Act of 1972, as amended, 16 U.S.C. §§ 1451–1464 (2006), plaintiffs submitted their IEP to the State of Louisiana, which approved the IEP on January 29, 2009, through the Department of Natural Resources, Office of Coastal Restoration and Management. *See* Compl. Ex. C. MMS then approved the IEP on February 6, 2009. *See* Compl. Ex. D.

Plaintiffs conducted a reservoir analysis of the leased area, which indicated "proved reserves" of approximately 12.7 million barrels of oil equivalent (BOE) and "probable re-serves" of approximately 2.4 million BOE.[4] These figures were later confirmed by an independent analysis.

On April 20, 2010, an explosion occurred on the Deepwater Horizon drilling vessel in the Gulf of Mexico during the completion of an exploratory well. The explosion killed eleven workers, and the subsequent loss of the vessel resulted in an oil spill that lasted several months and released a substantial quantity of crude oil into the Gulf of Mexico. Def.'s Mot. at 2.

On May 27, 2010, DOI issued a report (the Safety Measures Report) on the Deepwater Horizon oil spill, which recommended implementation of a six-month moratorium on permits for the drilling of new deepwater wells on the OCS. The next day, DOI issued a memorandum to MMS suspending all deepwater drilling operations in the Gulf of Mexico, whether pending, current, or approved. On May 30, 2010, in Notice to Lessees No. 2010–N04 (NTL4), MMS notified oil-and-gas lessees, including plaintiffs, of the six-month moratorium.[5]

In the summer and fall of 2010, MMS—and then BOEMRE—imposed a number of substantial new regulations and requirements on deepwater drilling operations on the OCS in the Gulf of Mexico. Plaintiffs allege that these requirements have substantially increased the economic costs of their performance under the lease.

On June 8, 2010, MMS issued Notice to Lessees No. 2010–N05 (NTL5), which imposed new substantive requirements on drilling operations on the OCS. These new requirements, which had been recommended in the DOI Safety Measures Report, applied to

3. Century Exploration New Orleans, Inc. owns a 90.472222–percent interest in the subject lease, while Champion owns the remaining 9.527778–percent interest. In its motion, defendant surmises that Champion acquired its interest in the subject lease in October 2009. In its overview of the facts, the court will generally refer to both plaintiffs collectively, even where the described event may have occurred before Champion acquired its interest in the lease.

4. The term "proved reserves" essentially refers to the quantity of petroleum that is expected to be recovered from the leased area with a reasonable degree of certainty, while "probable reserves" refers to the additional quantity of petro-leum that is less likely to be recovered than proved reserves but more likely to be recovered than "possible reserves." Compl. ¶ 11 nn. 5–6. There should be at least a fifty percent probability that the quantity of petroleum actually recovered will equal or exceed the sum of proved reserves and probable reserves (also known as "2P"). *Id.* ¶ 11 n. 6.

5. The United States District Court for the Eastern District of Louisiana subsequently enjoined enforcement of this moratorium on June 22, 2010. *See Hornbeck Offshore Servs., LLC v. Salazar,* 696 F.Supp.2d 627, 638–39 (E.D.La.2010).

all activities on the OCS, including plaintiffs' operations on the subject lease.[6]

On June 18, 2010, MMS issued Notice to Lessees No. 2010–N06 (NTL6), which rescinded certain limitations set forth in an earlier notice that addressed the information that lessees and operators were required to submit regarding blowout and worst-case discharge scenarios. NTL6 also modified the calculation of the worst-case discharge for purposes of Oil Spill Response Plans (OSRPs). This change, according to plaintiffs, increased the amount of Oil Spill Financial Responsibility (OSFR) that plaintiffs must demonstrate before performing under their lease. Plaintiffs assert that, due to that increase, it is now economically impracticable for plaintiffs to obtain a bond necessary to demonstrate sufficient OSFR.

NTL6 also requires operators to submit additional information for all Exploration Plans, Development Production Plans, and Development Coordination Documents— whether those documents had already been approved or were still pending—that involved activity authorized by a drilling permit that was not yet approved by the effective date of NTL6. Before NTL6, according to plaintiffs, lessees were required to provide additional information only on a case-by-case basis pursuant to 30 C.F.R. § 250.201(b) (2011). Plaintiffs assert that the new requirements of NTL6 violate that regulation and others.

On July 12, 2010, DOI issued a decision memorandum that rescinded the initial moratorium, but also ordered BOEMRE to issue a new suspension on drilling permits based upon a second deepwater moratorium to remain in effect through November 30, 2010. On August 16, 2010, the Director of BOEMRE directed the agency to no longer use certain categorical exclusions in performing reviews of drilling operations under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, 4331–4335 (2006). On September 27, 2010, BOEMRE required plaintiffs to revise their OSRP.

Plaintiffs submitted their revised OSRP on November 15, 2010. BOEMRE had not taken action on plaintiffs' OSRP as of January 25, 2011.

On October 1, 2010, the Director of BOEMRE submitted a decision memorandum to the Secretary of the Interior recommending that the second moratorium be lifted. DOI terminated the second moratorium in a decision memorandum on October 12, 2010, but also ordered BOEMRE to require the chief executive officer (CEO) of any operator seeking to perform deepwater drilling that would have been subject to the second moratorium to certify that the operator had complied with all applicable regulations.

In addition to imposing NTL5, BOEMRE drafted a Drilling Safety Rule (DSR) and a Workplace Safety Rule. Because of these actions, according to plaintiffs, the proved reserves associated with the lease were discounted by the senior lender at that time and subsequently by the financial markets. Ultimately, the high-yield debt to finance the project was issued at an interest rate that was higher than that paid by any other issuer of high-yield debt at that time.

The new DSR, including safety rules contained in NTL5 as well as other new substantive rules that had been recommended in the Safety Measures Report, was published in the Federal Register on October 14, 2010, 75 Fed.Reg. 63346. The DSR was published without notice and comment and became effective immediately upon publication. Under the DSR, when BOEMRE regulations incorporate documents of the American Petroleum Institute (API) by reference, operators and lessees must read the use of the term "should" to mean "must." BOEMRE regulations incorporate approximately eighty API documents, which contain 14,000 uses of the word "should."

On November 8, 2010, BOEMRE issued Notice to Lessees No. 2010–N10 (NTL10), which requires the CEO compliance statement discussed in the October 12, 2010 memorandum. NTL10 also informed lessees that

---

6. The Eastern District of Louisiana set aside NTL5 because it imposed new substantive requirements on drilling operations and was not promulgated in accordance with the require- ments of notice-and-comment rulemaking. *See Ensco Offshore Co. v. Salazar*, No. 10–1941, 2010 WL 4116892 (E.D.La. Oct. 19, 2010).

information submitted by the lessees regarding their access to and deployment of containment resources would be subject to additional scrutiny by BOEMRE.

BOEMRE has continued to issue new regulations and substantive edicts to the OCS lessees (through electronic mail and other means of communication). As of January 25, 2011, BOEMRE had not issued a new permit to drill in the deepwater of the Gulf of Mexico since April 2010.[7]

## II. Procedural History

On January 25, 2011, plaintiff Century Exploration New Orleans, Inc. (Century) filed its complaint in this court.[8] In its three-count complaint, Century asserts that the government breached its lease agreement with plaintiffs (Count I); that it effected an uncompensated—and therefore unconstitutional—taking of its private property under the Fifth Amendment (Count II); and that the government's activities may have given rise to other, unspecified causes of action (Count III). Century asserts that the government's actions in this case violated various sections of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2) (2006), as well as applicable regulations. Century requests a money judgment equal to its expectation damages under the lease or lost profits, whichever quantum is greater. In the alternative, Century seeks as just compensation the fair market value of its interest in the lease.

On April 5, 2011, defendant filed a motion to order joinder of a non-party, Champion, pursuant to RCFC 19(a). In the alternative, defendant asserts that the instant suit should be dismissed in its entirety pursuant to RCFC 12(b)(7) and RCFC 19(b) in the event that joinder of Champion proves to be infeasible. In addition, defendant further asserts in its motion that the takings claim raised in

Count II of the complaint must be dismissed under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. Because the property rights at issue in plaintiffs' takings claim were created by the lease that plaintiffs allege has been breached by the government, defendant argues that plaintiffs must seek relief under a breach of contract theory, not under a takings theory.

On April 22, 2011, Century responded to defendant's motion for joinder or, in the alternative, to dismiss. In its response, Century asserts that Champion is neither necessary nor indispensable to this litigation. In support of that assertion, Century argues that this court has the authority to accord complete relief to the parties in this case, and that a judgment against the government in the absence of Champion's participation would neither impair Champion's ability to enforce its rights nor subject the government to inconsistent obligations. In addition, Century further argues that even if Champion were determined to be a necessary party, it might be feasible to join Champion with or without its consent. Finally, Century contends that it would be premature to dismiss its takings claim before the government has even answered the complaint or the parties have conducted any discovery.

On May 9, 2011, defendant filed its reply to Century's response. Defendant first argues that Champion is a necessary party in this litigation because a judgment in favor of Century would render Champion's remaining interest in the lease essentially valueless. Defendant further argues that Champion is a necessary party for the additional reason that the failure to join Champion in this suit might subject the government to multiple and inconsistent judgments with respect to the same alleged breach of contract. Finally, defendant argues that a plaintiff cannot pursue concurrent takings and breach claims

---

7. During oral argument, counsel for defendant stated that the government had issued thirty-four permits to drill new wells in the Gulf of Mexico and one hundred revised permits since October 2010.

8. On November 23, 2010, Century sent to the President, the Secretary of the Interior, the Director of BOEMRE, local BOEMRE officials, and the Governor of Louisiana a letter that provided notice of Century's claims and requested a decision on those claims within sixty days as required under OCSLA, 43 U.S.C. § 1349(a)(2)(A). The letter and supporting documents were delivered to the United States on November 24, 2010. Century received no response from the government within the sixty-day time period.

when the property rights allegedly taken were created by the contract allegedly breached. Defendant contends that the cases cited by Century are distinguishable from this case because the plaintiffs in those cases alleged the taking of private property interests that were not created by the breached contract.

On June 21, 2011, the court issued an order directing the Clerk's Office to notify Champion of the pendency of this action as a potentially interested party pursuant to RCFC 14(b). That notice was duly issued by the Clerk's Office on July 19, 2011.

On September 12, 2011, Champion filed a complaint against defendant in accordance with RCFC 14(c). In its complaint, Champion adopts the allegations set forth in the initial complaint filed by Century, but reserves its right to make an election of remedies at a later date. Pursuant to a subsequent order of the court, Champion responded to defendant's pending motion to dismiss Count II of the complaint on October 14, 2011. In its response, Champion asserts that the government is incorrect in its assertion that property rights created by contract are categorically excluded from the protection of the Fifth Amendment. According to Champion, the court should not dismiss its takings claim before it has determined whether the government was acting in a proprietary or a sovereign capacity when it interfered with Champion's rights under the lease. In that regard, Champion contends that it should be allowed to pursue its takings claim in the event that its breach of contract claim is barred under an affirmative defense such as the sovereign acts defense.

Defendant filed its reply to Champion's response on October 31, 2011. While defendant acknowledges that there is authority from this court to support plaintiffs' argument that they may pursue concurrent takings and breach claims even if their asserted property rights were created by the breached contract, it argues that contrary authority from this court—holding that a takings claim is barred by a breach claim when the property rights alleged to have been taken were created by the contract that was alleged to

have been breached—is better reasoned and should be followed in this case. Defendant further asserts that the successful invocation of the sovereign acts defense in response to plaintiffs' breach claim would not allow plaintiffs to prevail under a takings theory. On the contrary, the government argues that a breach of contract may effect a taking only when the government prevents the enforcement of the contract by eliminating the forum for litigating the rights created by that contract.

The court heard oral argument from the parties on the government's motion to dismiss on November 8, 2011.

## DISCUSSION

### I. Standard of Review

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002). When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," however, dismissal is warranted under RCFC 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash-*

*croft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

## II. Analysis of Defendant's Motion to Dismiss

█ The issue now before the court is a narrow one: may a plaintiff pursue a breach of contract claim and a Fifth Amendment takings claim in the same suit when the property interest alleged to have been taken arises under the contract alleged to have been breached? For the reasons discussed below, the court answers that question in the affirmative.

### A. Uncompensated Takings of Contract Rights

Both the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have held that contractual rights are cognizable property interests protected under the Takings Clause of the Fifth Amendment. *See Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment."); *Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1370 (Fed.Cir.2005) ("If the party asserting the taking has contracted with the federal government, the contract itself may be a cognizable property interest that, if abrogated by legislation or regulatory action, may form the basis of a takings claim."). This court has held that the refusal to issue a drilling permit under an oil-and-gas lease may be a compensable taking of that lease. *See Bass Enters. Prod. Co. v. United States,* 45 Fed.Cl. 120, 122–23 (1999) (holding that the denial of applications for a permit to drill under an oil-and-gas lease effected a temporary taking of the lease).[9]

There are two broad—and distinct—categories of cases involving the alleged taking of contractual rights. First, there is the line of cases following *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). This line of authority involves cases in which the government interfered with a contract to which it was not a party. In *Omnia,* for example, the plaintiff had entered into a contract to purchase steel from a steel company. Before any steel was delivered to the plaintiff under the contract, the government requisitioned the entire output of the steel company. The plaintiff filed suit in the United States Court of Claims, alleging that the government had taken its contractual rights without the payment of just compensation. The Supreme Court concluded that there was no taking, and held that the government merely frustrated performance under the contract, but did not appropriate any rights created by the contract. In other words, unless the government steps into the shoes of one of the contracting parties, and thus assumes the contractual rights and obligations of one of those parties, there is no taking under *Omnia. See Brooks–Scanlon Corp. v. United States,* 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934 (1924) (holding that the government had taken a contract to build a custom-designed ship because it had appropriated, rather than merely frustrated the performance of, that contract). The present case does not involve the type of taking alleged in *Omnia.*

In addition to *Omnia* and its progeny, there is a second line of cases in which the government is actually one of the parties to the contract at issue. One of the most important—and frequently contested—threshold issues in this type of case is whether a plaintiff may raise a takings claim and a breach of contract claim in the same suit, particularly when the asserted property right was created by the breached contract. The takings claim advanced by plaintiffs in the present case falls into this second broad category.

---

**9.** The court subsequently granted the government's motion for reconsideration based on the Supreme Court's decision in *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), and dismissed the complaint. *See Bass Enters. Prod. Co. v. United States,* 54 Fed.Cl. 400 (2002), *aff'd,* 381 F.3d 1360 (Fed.Cir.2004).

## B. Case Law in this Court

██ In a number of cases, the Court of Claims, the Federal Circuit, and this court have warned against "commingling takings compensation and contract damages[.]" *See Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed.Cir.2001). In that regard, the Court of Claims has explained that the Takings Clause of the Fifth Amendment "has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract." *J.J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct.Cl.1969). When a plaintiff possesses enforceable rights under a contract with the government, "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct.Cl.1978). Notwithstanding those statements, however, the Federal Circuit has not held that plaintiffs coming before this court are categorically prohibited from raising a takings claim as well as a breach of contract claim in the same complaint, and pursuing both claims as alternative theories of recovery, although a takings claim might ultimately be barred for other reasons, such as a failure to demonstrate the existence of a property right protected by the Fifth Amendment.

In *Castle v. United States*, 301 F.3d 1328 (Fed.Cir.2002), for example, the plaintiffs in that case, *i.e.*, shareholders and creditors of a savings and loan association, argued that the United States had breached contracts with the association and also effected an uncompensated taking of their property rights when Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183. This court entered summary judgment in favor of the plaintiffs on their contract claims, but subsequently dismissed their takings claims on the basis that they did not possess protected property rights in any particular regulatory treatment of the savings and loan association. Rather, according to the court, the contracts guaranteed either performance or damages in the event of nonperformance. The Federal Circuit affirmed this court's dismissal of the takings claim, noting that the "breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein." *Castle*, 301 F.3d at 1342.

In short, the Federal Circuit did not hold in *Castle* that a plaintiff is precluded from raising a takings claim when its asserted property rights were created by contract; rather, the court merely held that the plaintiffs in that particular case had failed to demonstrate the existence of a compensable property right under their contract.[10] *Cf. Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1580 n. 8 (Fed.Cir.1997) (rejecting a nuclear utility's argument that an annual assessment for the decontamination and decommissioning of uranium enrichment facilities effected a taking of the utility's contract to purchase uranium enrichment services from the government at a specified price because the contract at issue did not contain an unmistakable promise that the utility would be immune from future assessments). In fact, as discussed in section II.C below, the Federal Circuit expressly held in *Stockton East Water District v. United States*, 583 F.3d 1344 (Fed.Cir.2009) (*Stockton East II*), that a plaintiff may plead, in the alternative, both a breach of contract claim and a takings claim in the same complaint.

Before the Federal Circuit's decision in *Stockton East II*, there had long been a split in this court with respect to the issue of whether a plaintiff may raise both a takings claim and a breach of contract claim in the same suit. In resolving the question of whether a plaintiff may pursue both claims, the judges on this court have generally focused on one or both of two issues related to the takings claim: (1) whether the government was acting in a sovereign or a proprie-

10. In contrast to the plaintiffs in this case, moreover, the plaintiffs in *Castle* did not raise their takings claim as an alternative to their breach claim; rather, they sought to recover under both legal theories. *See id.* ("[The plaintiffs] contend that the Fifth Amendment entitles them to just compensation *beyond* damages for breach of contract.") (emphasis added).

tary capacity when it interfered with the rights at issue; and (2) whether the property rights alleged to have been taken were created by the contract alleged to have been breached by the government.

### 1. Nature of the Governmental Action

In some cases, the Court of Claims, the Federal Circuit, and this court have held that the capacity in which the government acts is an important consideration in suits alleging an uncompensated taking of property rights created by contract. For example, in *Hughes Communications*, 271 F.3d at 1060, the plaintiff sought to recover prejudgment interest under a takings theory in addition to the damages it was awarded under a breach of contract theory. In rejecting the takings claim, the Federal Circuit noted that "[t]aking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity." *Id.* at 1070; *see also St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385 (Fed.Cir.2008) (holding that the government did not effect a taking because it was acting in its proprietary capacity); *Alaska Airlines, Inc. v. United States*, 8 F.3d 791, 798 (Fed.Cir.1993) (same); *Sun Oil*, 572 F.2d at 818 (noting that any interference "with plaintiffs' lease rights were grounded on matters that, at times material herein, bespoke an effort to operate within the framework of the lease and applicable regulations, not to take plaintiffs' property rights").

Similarly, in *Janicki Logging Co. v. United States*, 36 Fed.Cl. 338 (1996), *aff'd*, 124 F.3d 226 (Fed.Cir.1997), this court held that the deletion of an area from a timber sales contract did not effect a taking of any contract rights because the government had acted in a proprietary capacity, in accordance with its rights under the contract. *See id.* at 346 ("Hence, rather than acting as a sovereign and taking plaintiff's property for public use, the Forest Service acted in a proprietary capacity as a party to a contract and purported to exercise its rights for which it bargained in the contract."). In short, these cases hold that the exercise of sovereign power is a necessary condition of a taking because the government cannot effect a tak-ing when it is acting in its proprietary capacity.

Defendant argues that it is irrelevant whether the government was acting in a sovereign or proprietary capacity when it imposed the temporary moratoria on deep-water drilling in the Gulf of Mexico and implemented new regulations and requirements for such drilling. Some isolated statements by the Federal Circuit appear to support that assertion:

> In whatever other context it may be useful, moreover, determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis. The purpose and function of the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what the government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor. What counts is what the government *did*.

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed.Cir.1983) (citation omitted); *see also Henry Housing Ltd. P'ship v. United States*, 95 Fed.Cl. 250, 255 (2010) (noting that the "differentiation [between sovereign and propriety conduct] does not materially advance the analysis of either a breach of contract or a takings claim").

Here, the government confirmed during oral argument that it was acting in a sovereign capacity when it imposed the temporary moratoria and adopted the new regulations and requirements for deepwater drilling on the OCS. Thus, to the extent it could be argued that the existence of a sovereign act is a necessary prerequisite to a successful takings claim, the government has conceded here that it was acting in its sovereign capacity. It is clear, however, that the mere exercise of sovereign power by the government is not sufficient to demonstrate that the government has effected a taking of private property without just compensation. On the contrary, most exercises of the government's sovereign power do not result in a taking of private property requiring compensation. In

short, the fact that the government was acting in its sovereign capacity here does not dictate any particular result in this case.

## 2. Source of the Property Rights Allegedly Taken

In those cases that have focused on the source of the property rights alleged to have been taken, this court has not spoken with a unified voice. In some of those cases, the court has held that a plaintiff may pursue a takings claim and a breach claim in the same suit, but only if the property rights allegedly taken existed independently of the breached contract. Under those cases, when the asserted property right is created by the breached contract, the takings claim must be dismissed. In *Consumers Energy Co. v. United States*, 84 Fed.Cl. 152 (2008), for example, this court dismissed claims alleging that the government had effected an uncompensated taking of the plaintiff utility's vested contract rights as well as its physical facilities when the government breached its agreement to remove spent nuclear fuel and high-level radioactive waste from those facilities. The court noted that the utility's right to have those materials removed from its facilities was created by its contract with the government, and that any remedy must be based on a breach of that contract, not under a takings theory. *Id.* at 155–58; *see also Tamerlane Ltd. v. United States*, 80 Fed.Cl. 724, 738 (2008) (dismissing a takings claim because the "plaintiffs ha[d] not alleged any facts to suggest that the property rights underlying their claims exist independently of their contracts with the Government"); *Klamath Irrigation Dist. v. United States*, 67 Fed.Cl. 504, 530–33 (2005) (dismissing takings claims because they were based on

rights created by contracts with the government, which may be vindicated only under contract law), *vacated on other grounds*, 635 F.3d 505 (Fed.Cir.2011); *Canal Elec. Co. v. United States*, 65 Fed.Cl. 650, 654–56 (2005) (dismissing takings claim because asserted property rights were created solely by contract); *Allegre Villa v. United States*, 60 Fed.Cl. 11, 18 (2004) (same); *cf. Pi Elecs. Corp. v. United States*, 55 Fed.Cl. 279, 286 (2003) (finding that plaintiff possessed property rights that existed independently of its contract with the government, but dismissing takings claim for lack of authority).[11]

In other cases, however, this court has held that a plaintiff may plead and litigate both a takings claim and a breach claim, even if the asserted property right was created by the breached contract:

> It is appropriate to proceed with both claims until the contract claim reaches fruition. Only after the contract claim has been fully litigated will it be possible to determine if the contract claim is viable. Some decisions of the court have dismissed takings claims once the government has been held liable for breach of contract prior to addressing damages under a contractual theory, while others preserve both claims until final judgment is rendered. Each of these decisions embraces the underlying principle that contract and takings claims may be pled and argued in the alternative, and that a viable breach-of-contract claim trumps a valid takings claim. Viewed at the end of the proceedings in a case, these decisions may have produced the same results, but this court nonetheless holds that maintaining both claims is a more appropriate course prior

---

11. In some cases, this court has held that a plaintiff must allege the taking of a property right that exists independently of the breached contract, but has declined to dismiss the takings claim under RCFC 12(b)(6) when it is unclear, early in the litigation, whether such an independent right exists. *See, e.g., Barlow & Haun, Inc. v. United States*, 87 Fed.Cl. 428, 438–40 (2009) (declining to dismiss a takings claim because it was unclear whether the rights alleged to have been taken were created by the breached contract or existed independently of it); *Detroit Edison Co. v. United States*, 56 Fed.Cl. 299, 302–03 (2003) (declining to dismiss a takings claim because a more fully developed record would allow

the court to determine whether the asserted property rights were governed by the breached contract); *Integrated Logistics Support Sys. Int'l Inc. v. United States*, 42 Fed.Cl. 30, 35 (1998) ("Because the court cannot conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials, and because plaintiff has alleged facts sufficient to support the converse, defendant's motion does not preclude plaintiff from pleading a taking claim and breach of contract claim in the alternative."). In other cases, this court has rejected such an approach. *See Pac. Gas & Elec. Co. v. United States*, 70 Fed.Cl. 766, 780 n. 14 (2006).

to the time judgment is rendered on the contract claims.

*System Fuels, Inc. v. United States,* 65 Fed. Cl. 163, 172–73 (2005) (citations omitted); *see also Henry Housing,* 95 Fed.Cl. at 255 (holding that a plaintiff may pursue a takings claim and a breach claim in the alternative until final judgment is rendered on the breach claim); *Consol. Edison Co. of N.Y. v. United States,* 67 Fed.Cl. 285, 292 (2005) (noting that "claims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim").[12]

The court notes that in many of the cases in which this court dismissed claims based on an alleged taking of contractual rights, the court resolved the breach of contract claim before dismissing the alternative takings claim, or did so concurrently with its dismissal of the takings claim. *See, e.g., Castle,* 301 F.3d at 1331–32 (noting that this court granted summary judgment in favor of the plaintiffs on their breach of contract claim before dismissing their takings claim); *Hughes Communications,* 271 F.3d at 1065, 1070 (explaining that this court granted summary judgment in favor of the plaintiff on its contract claim and awarded damages on that claim, but denied the plaintiff's post-trial request for interest under the Fifth Amendment); *Sun Oil,* 572 F.2d at 817–19 (holding that the government was liable to the plaintiffs for contractual damages before dismissing their takings claim); *Consumers Energy,* 84 Fed.Cl. at 158 (dismissing takings claim after granting summary judgment in favor of the plaintiff on the issue of contractual liability); *Tamerlane,* 80 Fed.Cl. at 732–37 (dismissing breach claims as time-barred before dismissing takings claims); *Allegre Villa,* 60 Fed.Cl. at 15–17 (holding that the government breached its contracts with plaintiffs before dismissing the plaintiffs' alternative

takings claims); *Commonwealth Edison Co. v. United States,* 56 Fed.Cl. 652, 656 n. 8 (2003) (noting that the court had already held the government liable for a partial breach of contract before dismissing the plaintiff's alternative takings claim); *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 149, 152 (2002) (granting summary judgment in favor of the plaintiff on its breach of contract claim before dismissing its claim alleging a taking of its contractual rights).

In its response to the government's motion to dismiss, Century argues that the court should not dismiss plaintiffs' takings claim because further discovery might reveal that plaintiffs possess private property rights that exist independently of their lease. During oral argument, however, counsel for plaintiffs conceded that the private property rights alleged to have been taken in this case were created by the lease and do not exist independently of it. Nonetheless, plaintiffs maintain that their takings claim should be preserved until the court has resolved their breach claim. Plaintiffs argue that they should be allowed to proceed with their takings claim in the event that this court dismisses their breach of contract claim based on an affirmative defense such as the sovereign acts defense. In support of their position on that particular issue, plaintiffs reference this court's decision in *Franconia Associates v. United States,* 61 Fed.Cl. 718, 739 n. 33 (2004), which noted in *dicta* that when "the Government ... successfully invokes the sovereign act defense or otherwise interferes with the contract due to general legislative or administrative actions, its interference may be subject to a takings claim."

Defendant, in contrast, argues that the dismissal of plaintiffs' breach claim under the sovereign acts defense would not allow plaintiffs to proceed with their takings claim and

---

**12.** The court notes that there are cases from the Federal Circuit that bear a superficial similarity to the present case, and appear to support the approach of *System Fuels,* but are distinguishable on the basis that the plaintiffs in those cases were not in privity of contract with the government and therefore could not have raised a breach claim. *See Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003) (allowing

takings claims to proceed against the government because the plaintiffs had entered into contracts not with the government, but with private lenders); *Chancellor Manor v. United States,* 331 F.3d 891 (Fed.Cir.2003) (same); *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed.Cir. 1990) (reversing this court's dismissal of a takings claim and holding that the government had taken a lease to mine uranium on tribal land).

would in fact preclude such a claim. For its part, defendant cites *Klamath*, 67 Fed.Cl. at 532 n. 46, as standing for the proposition that the successful invocation of that defense, or any other affirmative defense, would demonstrate that plaintiffs have no rights under their contract that might form the basis of a takings claim. However, the portion of *Klamath* cited by defendant does not address the sovereign acts defense; instead, it merely states that a failure to demonstrate a breach of contract would preclude an alternative claim asserting a taking of that contract:

> At least as described in *Winstar* and *Castle*, the rule favoring contract remedies depends upon there being symmetry between the contract rights to be enforced and the contract damages that are potentially available. Once this symmetry is established, *a finding on the merits that no breach occurred* does not break that relationship, but merely reflects that the contract rights that were asserted either never existed or were not adversely affected by the government's actions. Under either scenario, those same contract rights cannot provide the predicate for a takings because the government cannot take what the claimant does not have.

*Id.* (emphasis added). While defendant may be correct that plaintiffs' failure to demonstrate a breach of contract would foreclose the argument that anything has been taken from them, that reasoning would not apply to the sovereign acts defense, which shields the government from contractual liability even when there is no question that the contract at issue has been breached by the government.[13]

Defendant posits that there is only one narrow circumstance in which a plaintiff might properly pursue a takings claim based on an interference with rights that were created by a contract with the government. According to defendant, a plaintiff may pursue a claim based on the alleged taking of contractual rights only when both of the following requirements are met: (1) the government repudiates a contract with the plaintiff; and (2) the government then eliminates the only forum for enforcing that contract. In support of its purported two-prong test, defendant points to the Supreme Court's decision in *Lynch*, 292 U.S. at 571, 54 S.Ct. 840. In that case, Congress enacted legislation that repudiated the government's obligation to make payments to veterans under earlier insurance contracts and also withdrew its waiver of sovereign immunity from suits related to any alleged breach of those contracts. Thus, in *Lynch*, the government both repudiated the disputed contracts and eliminated the forum for enforcing those contracts. Notwithstanding the circumstances set forth in the *Lynch* case, the Federal Circuit has not elevated the particular factual context of *Lynch* into a required threshold test to be applied to all takings claims, and this court declines to do so here. The court will not dismiss plaintiffs' takings claim based on the test proposed by defendant because it appears that doing so would be inconsistent with the Federal Circuit's binding decision in *Stockton East II*.

---

**13.** During oral argument, counsel for defendant stated that the government had performed exhaustive research of the case law and was not aware of a single case in which a court has held that a breach of contract action was barred by the sovereign acts defense, but then proceeded to award just compensation to the plaintiff under a Fifth Amendment takings theory. However, the court is aware of at least one such case. In *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16 (1984), the plaintiff had entered into a timber sales contract with the government under which it was allowed to harvest timber from certain areas within the Superior National Forest. When the areas covered by the sales contract were placed within the Boundary Waters Canoe Area Wilderness, the government suspended the contract. The plaintiff filed suit in the Claims Court seeking damages under a breach of contract theory as well as just compensation under the Fifth Amendment. The court concluded that the government was shielded from contract liability because the termination of the contract was a sovereign act, but further held that the plaintiff was entitled to just compensation under a takings theory. Furthermore, the court noted that the property taken by the government was not any tangible asset independent of the contract. Rather, "it was the contract itself that was the subject of the legislative taking." *Id.* at 27. *Hedstrom* is not binding on this court, and that case might be distinguishable from the present case in any event. But it does undermine the government's assertion that plaintiffs' position in this case is clearly foreclosed by this court's precedent.

### C. The Federal Circuit's Decision in *Stockton East*

In *Stockton East Water District v. United States*, 75 Fed.Cl. 321 (2007) (*Stockton East I*), several local water districts in California filed suit against the United States Bureau of Reclamation claiming that the Bureau had breached its contracts to provide specified quantities of water to the districts and also took the districts' private property without just compensation. This court concluded that the Bureau had not delivered the quantities of water specified under the contracts, but further held that its non-performance was excused by a shortage provision set forth in the contracts. Following its resolution of the breach claim, the court also dismissed the takings claim, noting that the "Government acted primarily in its commercial capacity in executing and implementing the ... Contracts, not in its sovereign capacity." *Id.* at 374. In support of that holding, the court cited *Hughes Communications*, 271 F.3d at 1070, *Alaska Airlines*, 8 F.3d at 798, and *Sun Oil*, 572 F.2d at 818.

The Federal Circuit vacated this court's dismissal of the takings claim, noting that the language in the cases upon which the court had based its decision was "nothing more than a passing comment about government contract law, and has to be understood in that context." *Stockton East II*, 583 F.3d at 1368. Those cases, according to the Federal Circuit,

> cannot be understood as precluding a party from alleging in the same complaint two alternative theories for recovery against the Government, for example, one for breach of contract and one for a taking under the Fifth Amendment to the Constitution. That is expressly permitted by the Federal Rules, and the fact that the theories may be inconsistent is of no moment.

*Id.* (citing Fed.R.Civ.P. 8(d)(3)).

The Federal Circuit explained that it is entirely appropriate for this court to defer its consideration of a takings claim while the court addresses a concurrently pled breach of contract claim:

> [W]hen a case arises in which both a contract and a taking cause of action are pled, the trial court may properly defer the tak-

ing issue, as it did here, in favor of first addressing the contract issue. It has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue.

*Id.*

In addition, the Federal Circuit noted that when a plaintiff is ultimately awarded damages under a breach of contract theory, that plaintiff cannot also recover under its alternative takings theory:

> It is well established, as these cases explain, that a party can obtain only one recovery for a single harm regardless of how many legal theories there may be for a recovery. In our case, while one recovery is all that can be had for the same harm, the fact that a cause of action was pled under a contract theory did not preclude a separate count for a cause of action based on a taking.

*Id.* at 1369. In the view of the Federal Circuit, the cases cited by this court in *Stockton East I* do not stand for the proposition that a plaintiff cannot pursue a claim under the Fifth Amendment based on the alleged taking of contractual rights; rather, those cases merely state that a plaintiff cannot recover twice for the same harm by invoking two different legal theories. For that reason, once a plaintiff recovers under a breach theory, the court need not address the merits of the alternative takings claim. *Id.* at 1368 ("And of course when a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories.").

The government attempts to distinguish *Stockton East II* on the basis that the plaintiffs in that case alleged the taking of a property interest that existed independently of the plaintiffs' contracts with the Bureau. More specifically, the government notes that the plaintiffs in that case alleged that they possessed a protected property interest under state law in the water covered under the contracts. While that observation is accurate, the Federal Circuit did not vacate this court's dismissal of the plaintiffs' takings claim on that basis. In fact, the Federal

Circuit indicated that it viewed the alleged breach of the contracts in that case and the uncompensated taking of the water covered under those contracts as the same "harm," which suggests that the Federal Circuit did not believe the plaintiffs' asserted water rights existed independently of their contracts.[14]

Defendant also argues that the Federal Circuit's holding in *Stockton East II* should not be read to endorse the proposition that a plaintiff may pursue a takings claim when it has failed to recover on a breach of contract claim. In its opinion, however, the Federal Circuit stated that the plaintiffs "are free to pursue their takings claim if they so choose with regard to the years for which the Government has been found not liable as a matter of contract law." 583 F.3d at 1369. Furthermore, in his dissent from the panel's subsequent decision on rehearing, Judge Gajarsa opined that "the United States should have challenged the majority's conclusion that a party to a contract with the United States, having failed to establish damages in a contract action, may proceed with a Fifth Amendment takings action." *Stockton E. Water Dist. v. United States,* 638 F.3d 781, 785 (Fed.Cir.2011) (Gajarsa, J., dissenting) (*Stockton East III*). These statements indicate that the Federal Circuit's decision in *Stockton East II* stands for precisely the proposition that defendant argues it does not.

Finally, defendant asserts that the Federal Circuit's discussion of the takings issue in *Stockton East II* should be viewed as nothing more than *dicta* in light of Judge Gajarsa's dissent from that decision and his dissent from *Stockton East III*. However, the mere absence of unanimity in a Federal Circuit holding does not render that holding *dicta.* The Federal Circuit has held that a plaintiff may pursue both a takings claim and a breach of contract claim in the same complaint, and that holding was not *dicta.* Ac-

cordingly, this court will not dismiss plaintiffs' takings claim on that basis.

The court notes that the scope of its holding in this opinion is quite narrow. The court does not hold that plaintiffs will prevail on their takings claim, nor does it hold that plaintiffs may successfully proceed with their takings claim if the government successfully invokes the sovereign acts defense. Those issues have not been fully addressed by the parties, so the court will not resolve them here. Rather, the sole holding set forth in this opinion is that this court is not required to dismiss a takings claim under RCFC 12(b)(6) for the mere reason that the property rights alleged to have been taken by the government were created by the same contract plaintiffs assert has been breached. Because the viability of plaintiffs' takings claim will turn on the court's resolution of their breach claim, the takings claim shall be stayed during the litigation of the breach claim.

## CONCLUSION

The court concludes that plaintiffs are not precluded from pursuing, in the same complaint, a breach of contract claim and a Fifth Amendment takings claim as alternative theories of recovery. For that reason, defendant's motion to dismiss Count II of the complaint under RCFC 12(b)(6) is denied. Because Champion is now a party to this suit, defendant's motion for joinder is denied as moot.

Accordingly, it is hereby **ORDERED** that

(1) Defendant's Motion to Dismiss Count II of the Complaint, filed April 5, 2011, is **DENIED;**

(2) Defendant's Motion for Joinder of Champion Exploration, LLC or, in the Alternative, to Dismiss, filed April 5, 2011, is **DENIED** as moot;

(3) Defendant shall **FILE** its **Answer** to plaintiffs' complaints, or otherwise re-

---

14. Defendant also attempts to distinguish *Stockton East II* on the basis that the government's action in that case "significantly affected" the plaintiffs' water contracts, while the governmental action here involved regulations that were expressly contemplated under the lease. While that distinction might ultimately impact the court's analysis of whether plaintiffs have demonstrated a regulatory taking under *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), it is of little relevance to the threshold issue now before the court.

spond to them, on or before **February 24, 2012.**[15]

---

**15.** With respect to a potential settlement of this matter, the court reminds the parties that this case was assigned to Judge Christine O.C. Miller for Alternative Dispute Resolution (ADR) on January 25, 2011.